Justice Breyer
delivered the opinion of the Court.
The Commonwealth of Kentucky permits policemen, firemen, and other “hazardous position” workers to retire and to receive “normal retirement” benefits after either (1) working for 20 years; or (2) working for 5 years and attaining the age of 55. See Ky. Rev. Stat. Ann. §§ 16.576,16.577(2) (Lexis 2003), 61.592(4) (Lexis Supp. 2003). It permits those who become seriously disabled but have not otherwise become eligible for retirement to retire immediately and receive “disability retirement” benefits. See § 16.582(2)(b) (Lexis 2003). And it treats some of those disabled individuals more generously than it treats some of those who became disabled only after becoming eligible for retirement on the basis of age. The question before us is whether Kentucky’s system consequently discriminates against the latter workers “because of . . . age.” Age Discrimination in Employment Act of 1967 (ADEA or Act), § 4(a)(1), 81 Stat. 603, 29 U. S. C. § 623(a)(1). We conclude that it does not.
*139 I
A
Kentucky has put in place a special retirement plan (Plan) for state and county employees who occupy “[h]azardous position[sj,” e. g., active duty law enforcement officers, firefighters, paramedics, and workers in correctional systems. See Ky. Rev. Stat. Ann. § 61.592(1)(a) (Lexis Supp. 2003). The Plan sets forth two routes through which such an employee can become eligible for what is called “normal retirement” benefits. The first makes an employee eligible for retirement after 20 years of service. The second makes an employee eligible after only 5 years of service provided that the employee has attained the age of 55. See §§ 16.576, 16.577(2), 61.592(4). An employee eligible under either route will receive a pension calculated in the same way: Kentucky multiplies years of service times 2.5% times final preretirement pay. See § 16.576(3).
Kentucky’s Plan has special provisions for hazardous position workers who become disabled but are not yet eligible for normal retirement. Where such an employee has worked for five years or became disabled in the line of duty, the employee can retire at once. See §§ 16.576(1), 16.582(2) (Lexis 2003). In calculating that employee’s benefits Kentucky will add a certain number of (“imputed”) years to the employee’s actual years of service. The number of imputed years equals the number of years that the disabled employee would have had to continue working in order to become eligible for normal retirement benefits, i. e., the years necessary to bring the employee up to 20 years of service or to at least 5 years of service when the employee would turn 55 (whichever number of years is lower). See § 16.582(5)(a) (Lexis 2003). Thus, if an employee with 17 years of service becomes disabled at age 48, the Plan adds 3 years and calculates the benefits as if the employee had completed 20 years of service. If an employee with 17 years of service becomes *140 disabled at age 54, the Plan adds 1 year and calculates the benefits as if the employee had retired at age 55 with 18 years of service.
The Plan also imposes a ceiling on imputed years equal to the number of years the employee has previously worked (i. e., an employee who has worked eight years cannot receive more than eight additional imputed years), see § 16.582(5)(a); it provides for a certain minimum payment, see § 16.582(6) (Lexis 2003); and it contains various other details, none of which is challenged here.
B
Charles Lickteig, a hazardous position worker in the Jefferson County Sheriff’s Department, became eligible for retirement at age 55, continued to work, became disabled, and then retired at age 61. The Plan calculated his annual pension on the basis of his actual years of service (18 years) times 2.5% times his final annual pay. Because Lickteig became disabled after he had already become eligible for normal retirement benefits, the Plan did not impute any additional years for purposes of the calculation.
Lickteig complained of age discrimination to the Equal Employment Opportunity Commission (EEOC); and the EEOC then brought this age discrimination lawsuit against the Commonwealth of Kentucky, Kentucky’s Plan administrator, and other state entities (to whom we shall refer collectively as “Kentucky”). The EEOC pointed out that, if Lickteig had become disabled before he reached the age of 55, the Plan, in calculating Lickteig’s benefits, would have imputed a number of additional years. And the EEOC argued that the Plan failed to impute years solely because Lickteig became disabled after he reached age 55.
The District Court, making all appropriate evidence-related assumptions in the EEOC’s favor, see Fed. Rule Civ. Proc. 56, held that the EEOC could not establish age discrimination; and it granted summary judgment in the defendants’ favor. A panel of the Sixth Circuit affirmed that *141 judgment. EEOC v. Jefferson Cty. Sheriff’s Dept. 424 F. 3d 467 (2005). The Sixth Circuit then granted rehearing en banc, held that Kentucky’s Plan did violate the ADEA, and reversed and remanded for further proceedings. 467 F. 3d 571 (2006).
Kentucky sought certiorari. In light of the potentially serious impact of the Circuit’s decision upon pension benefits provided under plans in effect in many States, we granted the writ. See, e. g., Ind. Code §§ 36-8-8-13.3(b) and (c) (West 2004); Mich. Comp. Laws Ann. §§ 38.23 and 38.556(2)(d) (West 2005); N. C. Gen. Stat. Ann. §§ 135-1 and 135-5 (Lexis 2007); 71 Pa. Cons. Stat. §§ 5102 and 5704 (2001 and Supp. 2007); Tenn. Code Ann. § 8-36-501(c)(3) (Supp. 2007). See also Reply Brief for Petitioners 20-21 (predicting, inter alia, large increase in pension liabilities, potential reduction in benefits for all disabled persons, or both); Brief for National Association of State Retirement Administrators et al. as Amici Curiae 8-14 (same).
II
The ADEA forbids an employer to “fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s age.” 29 U. S. C. § 623(a)(1) (emphasis added). In Hazen Paper Co. v. Biggins, 507 U. S. 604 (1993), the Court explained that where, as here, a plaintiff claims age-related “disparate treatment” (i. e., intentional discrimination “because of... age”) the plaintiff must prove that age “actually motivated the employer’s decision.” Id., at 610 (emphasis added); see also Reeves v. Sanderson Plumbing Products, Inc., 530 U. S. 133, 141 (2000). The Court noted that “[t]he employer may have relied upon a formal, facially discriminatory policy requiring adverse treatment” because of age, or “the employer may have been motivated by [age] on an ad hoc, informal basis.” Hazen Paper, 507 U. S., at *142 610. But “[w]hatever the employer’s decisionmaking process,” a plaintiff alleging disparate treatment cannot succeed unless the employee’s age “actually played a role in that process and had a determinative influence on the outcome.” Ibid, (emphasis added). Cf. Smith v. City of Jackson, 544 U. S. 228, 239-240 (2005) (plurality opinion) (describing “disparate-impact” theory, not here at issue, which focuses upon unjustified discriminatory results).
In Hazen Paper, the Court considered a disparate-treatment claim that an employer had unlawfully dismissed a 62-year-old employee with over 9Vz years of service in order to avoid paying pension benefits that would have vested after 10 years. The Court held that, without more evidence of intent, the ADEA would not forbid dismissal of the claim. A dismissal based on pension status was not a dismissal “because of . . . age.” 507 U. S., at 611-612. Of course, pension status depended upon years, of service, and years of service typically go hand in hand with age. Id., at 611. But the two concepts were nonetheless “analytically distinct.” Ibid. An employer could easily “take account of one while ignoring the other.” Ibid. And the dismissal in question, if based purely upon pension status (related to years of service), would not embody the evils that led Congress to enact the ADEA in the first place: The dismissal was not based on a “prohibited stereotype” of older workers, did not produce any “attendant stigma” to those workers, and was not “the result of an inaccurate and denigrating generalization about age.” Id., at 612.
At the same time, Hazen Paper indicated that discrimination on the basis of pension status could sometimes be unlawful under the ADEA, in particular where pension status served as a “proxy for age.” Id., at 613. Suppose, for example, an employer “targeted] employees with a particular pension status on the assumption that these employees are likely to be older.” Id., at 612-613. In such a case, Hazen Paper suggested, age, not pension status, would have “ac *143 tually motivated” the employer’s decisionmaking. Hazen Paper also left open “the special case where an employee is about to vest in pension benefits as a result of his age, rather than years of service.” Id., at 613. We here consider a variation on this “special case” theme.
Ill
Kentucky’s Plan turns normal pension eligibility either upon the employee’s having attained 20 years of service alone or upon the employee’s having attained 5 years of service and reached the age of 55. The ADEA permits an employer to condition pension eligibility upon age. See 29 U. S. C. § 623(0(1)(A)(i) (2006 ed.). Thus we must decide whether a plan that (1) lawfully makes age in part a condition of pension eligibility, and (2) treats workers differently in light of their pension status, (3) automatically discriminates because of age. The Government argues “yes.” But, following Hazen Paper’s approach, we come to a different conclusion. In particular, the following circumstances, taken together, convince us that, in this particular instance, differences in treatment were not “actually motivated” by age.
First, as a matter of pure logic, age and pension status remain “analytically distinct” concepts. Hazen Paper, 507 U. S., at 611. That is to say, one can easily conceive of decisions that are actually made “because of” pension status and not age, even where pension status is itself based on age. Suppose, for example, that an employer pays all retired workers a pension, retirement eligibility turns on age, say, 65, and a 70-year-old worker retires. Nothing in language or in logic prevents one from concluding that the employer has begun to pay the worker a pension, not because the worker is over 65, but simply because the worker has retired.
Second, several background circumstances eliminate the possibility that pension status, though analytically distinct from age, nonetheless serves as a “proxy for age” in Ken *144 tucky’s Plan. Cf. id., at 613. We consider not an individual employment decision, but a set of complex systemwide rules. These systemic rules involve, not wages, but pensions— a benefit that the ADEA treats somewhat more flexibly and leniently in respect to age. See, e. g., 29 U. S. C. § 623(0(1)(A)(i) (explicitly allowing pension eligibility to turn on age); § 623(/)(2)(A) (allowing employer to consider (age-related) pension benefits in determining level of severance pay); § 623(0(3) (allowing employer to consider (age-related) pension benefits in determining level of long-term disability benefits). And the specific benefit at issue here is offered to all hazardous position workers on the same nondiscriminatory terms ex ante. That is to say, every such employee, when hired, is promised disability retirement benefits should he become disabled prior to the time that he is eligible for normal retirement benefits.
Furthermore, Congress has otherwise approved of programs that calculate permanent disability benefits using a formula that expressly takes account of age. For example, the Social Security Administration now uses such a formula in calculating Social Security Disability Insurance benefits. See, e.g., 42 U. S. C. § 415(b)(2)(B)(iii); 20 CFR § 404.211(e) (2007). And until (and in some cases after) 1984, federal employees received permanent disability benefits based on a formula that, in certain circumstances, did not just consider age, but effectively imputed years of service only to those disabled workers younger than 60. See 5 U. S. C. § 8339(g) (2006 ed.); see also Office of Personnel Management, Disability Retirement Under the Civil Service Retirement System, Retirement Facts 4, p. 3 (rev. Nov. 1997), online at http://www.opm.gov/forms/pdfimage/RI83-4.pdf (as visited June 16, 2008, and available in Clerk of Court’s case file).
Third, there is a clear non-age-related rationale for the disparity here at issue. The manner in which Kentucky calculates disability retirement benefits is in every important respect but one identical to the manner in which Kentucky *145 calculates normal retirement benefits. The one significant difference consists of the fact that the Plan imputes additional years of service to disabled individuals. But the Plan imputes only those years needed to bring the disabled worker’s years of service to 20 or to the number of years that the individual would have worked had he worked to age 55. The disability rules clearly track Kentucky’s normal retirement rules.
It is obvious, then, that the whole purpose of the disability rules is, as Kentucky claims, to treat a disabled worker as though he had become disabled after, rather than before, he had become eligible for normal retirement benefits. Age factors into the disability calculation only because the normal retirement rules themselves permissibly include age as a consideration. No one seeking to help disabled workers in the way that Kentucky’s rules seek to help those workers would care whether Kentucky’s normal system turned eligibility in part upon age or upon other, different criteria.
That this is so is suggested by the fact that one can readily construct a plan that produces an identical disparity but is age neutral. Suppose that Kentucky’s Plan made eligible for a pension (1) day-shift workers who have 20 years of service, and (2) night-shift workers who have 15 years of service. Suppose further that the Plan calculates the amount of the pension the same way in either case, which method of calculation depends solely upon years of service (say, giving the worker a pension equal to $1,000 for each year of service). If the Plan were then to provide workers who become disabled prior to pension eligibility the same pension the workers would have received had they worked until they became pension eligible, the Plan would create a disparity between disabled day-shift and night-shift workers: A day-shift worker who becomes disabled before becoming pension eligible would, in many instances, end up receiving a bigger pension than a night-shift worker who becomes disabled after becoming pension eligible. For example, a *146 day-shift worker who becomes disabled prior to becoming pension eligible would receive an annual pension of $20,000, while a night-shift worker who becomes disabled after becoming pension eligible, say, after 16 years of service, would receive an annual pension of $16,000.
The disparity in this example is not “actually motivated” by bias against night-shift workers. Rather, such a disparity, like the disparity in the case before us, is simply an artifact of Plan rules that treat one set of workers more generously in respect to the timing of their eligibility for normal retirement benefits but which do not treat them more generously in respect to the calculation of the amount of their normal retirement benefits. The example helps to show that the Plan at issue in this case simply seeks to treat disabled employees as if they had worked until the point at which they would be eligible for a normal pension. The disparity turns upon pension eligibility and nothing more.
Fourth, although Kentucky’s Plan placed an older worker at a disadvantage in this case, in other cases, it can work to the advantage of older workers. Consider, for example, two disabled workers, one of whom is aged 45 with 10 years of service, one of whom is aged 40 with 15 years of service. Under Kentucky’s scheme, the older worker would actually get a bigger boost of imputed years than the younger worker (10 years would be imputed to the former, while only 5 years would be imputed to the latter). And that fact helps to confirm that the underlying motive is not an effort to discriminate “because of. . . age.”
Fifth, Kentucky’s system does not rely on any of the sorts of stereotypical assumptions that the ADEA sought to eradicate. It does not rest on any stereotype about the work capacity of “older” workers relative to “younger” workers. See, e. g., General Dynamics Land Systems, Inc. v. Cline, 540 U. S. 581, 590 (2004) (noting that except on one point, all the findings and statements of objectives in the ADEA are *147 “either cast in terms of the effects of age as intensifying over time, or are couched in terms that refer to ‘older’ workers, explicitly or implicitly relative to ‘younger’ ones” (emphasis added)). The Plan does assume that all disabled workers would have worked to the point at which they would have become eligible for a pension. It also assumes that no disabled worker would have continued working beyond the point at which he was both (1) disabled and (2) pension eligible. But these “assumptions” do not involve age-related stereotypes, and they apply equally to all workers, regardless of age.
Sixth, the nature of the Plan’s eligibility requirements means that, unless Kentucky were severely to cut the benefits given to disabled workers who are not yet pension eligible (which Kentucky claims it will do if its present Plan is unlawful), Kentucky would have to increase the benefits available to disabled, pension-eligible workers, while lacking any clear criteria for determining how many extra years to impute for those pension-eligible workers who already are 55 or older. The difficulty of finding a remedy that can both correct the disparity and achieve the Plan’s legitimate objective — providing each disabled worker with a sufficient retirement benefit, namely, the normal retirement benefit that the worker would receive if he were pension eligible at the time of disability — further suggests that this objective and not age “actually motivated” the Plan.
The above factors all taken together convince us that the Plan does not, on its face, create treatment differences that are “actually motivated” by age. And, for present purposes, we accept the District Court’s finding that the Government has pointed to no additional evidence that might permit a factfinder to reach a contrary conclusion. See App. 28-30.
It bears emphasizing that our opinion in no way unsettles the rule that a statute or policy that facially discriminates based on age suffices to show disparate treatment under the *148 ADEA. We are dealing today with the quite special case of differential treatment based on pension status, where pension status — with the explicit blessing of the ADEA — itself turns, in part, on age. Further, the rule we adopt today for dealing with this sort of case is clear: Where an employer adopts a pension plan that includes age as a factor, and that employer then treats employees differently based on pension status, a plaintiff, to state a disparate-treatment claim under the ADEA, must come forward with sufficient evidence to show that the differential treatment was “actually motivated” by age, not pension status. And our discussion of the factors that lead us to conclude that the Government has failed to make the requisite showing in this case provides an indication of what a plaintiff might show in other cases to meet his burden of proving that differential treatment based on pension status is in fact discrimination “because of” age.
IV
The Government makes two additional arguments. First, it looks for support to an amendment that Congress made to the ADEA after this Court’s decision in Public Employees Retirement System of Ohio v. Betts, 492 U. S. 158 (1989). In Betts, the employer denied a worker disability benefits on the ground that its bona fide benefit program provided disability benefits only to workers who became disabled prior to age 60, and the worker in that case became disabled at age 61. Id., at 163. The ADEA at that time exempted from its prohibitions employment decisions taken pursuant to the terms of “ ‘any bona fide employee benefit plan . . . which is not a subterfuge to evade the purposes of the Act.” Id., at 161 (quoting 29 U. S. C. § 623(f)(2) (1982 ed.)). And the Court held that the employer’s decision fell within that exception. 492 U. S., at 182. Subsequently Congress amended the ADEA to make clear that it covered age-based discrimination in respect to all employee benefits. See Older Workers Benefit Protection Act, § 102, 104 Stat. 978, *149 29 U. S. C. § 630(0 (2000 ed.). Congress replaced the “not a subterfuge” exception with a provision stating that age-based disparities in the provision of benefits are lawful only when they are justified in respect to cost savings. Id., at 978-979, 29 U. S. C. § 623(f)(2)(B)(i).
We agree with the Government that the amendment broadened the field of employer actions subject to antidiscrimination rules and it narrowed the statutorily available justifications for age-related differences. But these facts cannot help the Government here. We do not dispute that ADEA prohibitions apply to the Plan at issue, and our basis for finding the Plan lawful does not rest upon amendment-related justifications. Rather, we find that the discrimination is not “actually motivated” by age. Thus Hazen Paper, not Betts, provides relevant precedent. And the amendment cited by the Government is beside the point.
Second, the Government says that we must defer to a contrary EEOC interpretation contained in an EEOC regulation and compliance manual. The regulation, however, says only that providing “the same level of benefits to older workers as to younger workers” does not violate the Act. 29 CFR § 1625.10(a)(2) (2007). The Government’s interpretation of this language is not entitled to deference because, on its face, the regulation “does little more than restate the terms of the statute itself.” Gonzales v. Oregon, 546 U. S. 243, 257 (2006) (denying deference to an agency interpretation of its own regulation in light of the “near equivalence” of the statute and regulation).
The compliance manual provides more explicitly that benefits are not “equal” insofar as a plan “reduces or eliminates benefits based on a criterion that is explicitly defined (in whole or in part) by age.” 2 EEOC Compliance Manual § 3, p. 627:0004 (2001) (bold typeface deleted). And the compliance manual further provides that “[biasing disability retirement benefits on the number of years a disabled employee would have worked until normal retirement age by definition *150 gives more constructive years of service to younger than to older employees” and thus violates the Act. See id., at 627:0010.
These statements, while important, cannot lead us to a different conclusion. See National Railroad Passenger Corporation v. Morgan, 536 U. S. 101, 111, n. 6 (2002) (noting that compliance manuals are “‘“entitled to respect” under our decision in Skidmore v. Swift & Co., 323 U. S. 134, 140 (1944)’ ”); see also Christensen v. Harris County, 529 U. S. 576, 587 (2000). Following Hazen Paper, we interpret the Act as requiring a showing that the discrimination at issue “actually motivated” the employer’s decision. Given the reasons set forth in Part III, supra, we conclude that evidence of that motivation was lacking here. And the EEOC’s statement in the compliance manual that it automatically reaches a contrary conclusion—a statement that the manual itself makes little effort to justify—lacks the necessary “power to persuade” us. Skidmore v. Swift & Co., 323 U. S. 134, 140 (1944).
y
The judgment of the Court of Appeals is reversed.

It is so ordered.