# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1730
_____

| | | |
|---|---|---|
| Northwest Airlines, Inc., | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | |
| Air Line Pilots Association, | * | |
| | * | |
| Intervenor below-Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Raymond B. Phillips; Michael | * | District of Minnesota. |
| Tanksley; Belmont Beck; Platt | * | |
| Hubbell; Timothy I. Meldahl; | * | |
| George S. Novotny; William J. | * | |
| Riley; Ralph C. Taylor, Individually, | * | |
| and as Representatives of Persons | * | |
| Similarly Situated, | * | |
| | * | |
| Defendants-Appellants. | * | |

_____

Submitted: December 15, 2011
Filed: April 9, 2012
_____

Before LOKEN, BRIGHT, and SHEPHERD, Circuit Judges.
_____

BRIGHT, Circuit Judge.

Appellees Northwest Airlines, Inc. (Northwest) and the Air Line Pilots Association (Pilots Association) filed a complaint seeking a declaratory judgment that their post-bankruptcy retirement benefit plan, the Money Purchase Plan for Pilot Employees (MP3), complied with the Employment Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461 (2000). Appellants, a group of older Northwest pilots (older Pilots),[1] counterclaimed arguing that the MP3 retirement benefit plan violated ERISA, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634 (2000), and several state laws prohibiting age discrimination. The district court[2] granted Northwest's and the Pilots Association's motions for summary judgment. On appeal, the older Pilots argue that the MP3 illegally reduces or eliminates their retirement benefit payments because of age and that the district court improperly disregarded the declaration of one of their experts. We affirm.

## I. Background

In September 2005, Northwest declared bankruptcy. Prior to that point, Northwest provided retirement benefits to its pilots through a defined benefit plan—the Northwest Airlines Pension Plan for Pilot Employees (Pension Plan).[3]

---

[1]For the purposes of the ERISA claim, appellants represent a class of pilots who are covered by the MP3, are age 40 or over, and who receive no contributions under the MP3, or receive smaller contributions under the MP3 than under the pro rata to pay claim. For the purposes of the ADEA claim, appellants bring their claim as a collective action under 29 U.S.C. § 626(b) (incorporating 29 U.S.C. § 216(b)) on behalf of pilots in the same situation.

[2]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

[3]As the district court helpfully noted, in a defined benefit plan, the employer bears the risk of investment performance because the benefit is generally guaranteed regardless of how the market performs. *See Hirt v. Equitable Ret. Plan for Emps., Managers, & Agents*, 533 F.3d 102, 104–05 (2d Cir. 2008), cited in *Nw. Airlines, Inc.*

Under the Pension Plan, pilots received retirement benefits up to 60% of their final average earnings depending on the pilot's years of service. In addition, pilots had the ability to contribute on their own to a defined contribution plan.[4]

After declaring bankruptcy, the airline and Pilots Association obtained passage of legislation permitting Northwest to spread funding of the Pension Plan over an additional number of years instead of terminating the plan. *See* Pension Protection Act of 2006, Pub. L. No. 109-280, § 402, 120 Stat. 780 (codified in scattered sections of 26 and 29 U.S.C.). Termination of the Pension Plan would have significantly reduced the pilots' retirement benefits.[5] Instead, Northwest and the Pilots Association froze the Pension Plan—fixing each pilot's benefits under the plan as of January 31, 2006. No future years of service or earnings after that date could be used to calculate benefits.

To replace the Pension Plan, Northwest and the Pilots Association initially reached an agreement for Northwest to contribute a defined percentage of a pilot's earnings to a retirement savings account for each pilot (pro rata to pay). The percentage of Northwest's contributions would increase through 2011 and then remain

_____

*v. Phillips*, 594 F. Supp. 2d 1075, 1080 n.2 (D. Minn. 2009).

[4]In a defined contribution plan, the employee bears the risk of investment performance and receives a benefit based on the amount contributed to an individual account, along with any income, expenses, gains, and losses. *See Hirt*, 533 F.3d at 104–05, cited in *Nw. Airlines*, 594 F. Supp. 2d at 1080 n.3.

[5]Only a portion of the pilots' pension benefits would have been covered by the Pension Benefit Guaranty Corporation under Title IV of ERISA. The rest would have been lost, as happened when United Airlines and US Airways terminated their pension plans during bankruptcy. *See United Retired Pilots Benefit Prot. Ass'n v. United Airlines, Inc. (In re UAL Corp.)*, 443 F.3d 565 (7th Cir. 2006); *Retired Pilots Ass'n of U.S. Airways, Inc. v. U.S. Airways Grp., Inc. (In re U.S. Airways Grp., Inc.)*, 369 F.3d 806 (4th Cir. 2004).

constant at 8% of the pilot's earnings. The letter agreement also provided the option for the Pilots Association to determine an alternate method for Northwest to allocate contributions to retirement savings accounts "subject to [Northwest's] agreement that it is legal, complies with applicable regulations, and is administratively feasible."

However, the Pilots Association calculated that the combination of the frozen Pension Plan and the pro rata to pay contributions would have led to significant disparity in retirement income between more senior pilots, who had accrued substantial benefits under the frozen Pension Plan, and pilots with less years of service under the frozen plan.[6] To address this disparity, the Pilots Association proposed changing the method for allocating Northwest's contributions to a target benefit plan.[7] The goal was to allocate contributions so that all pilots, in combination with the frozen Pension Plan, would receive "an aggregate replacement income equal to approximately 50% of their final average earnings as an active pilot (or frozen [Pension Plan] benefit if higher)." The majority of the pilots voted in favor of the Pilots Association's proposed restructuring agreement, which included the targeted methodology for allocating retirement benefits. Northwest and the Pilots Association subsequently negotiated the specifics of what became the challenged MP3 and executed a letter agreement implementing the plan on December 11, 2007.

---

[6]Actuaries for the Pilots Association estimated that under the flat pro rata to pay plan some pilots would have received 70–75% of their projected final average earnings, while others would receive as little as 30–35% due to the effects of the frozen Pension Plan. Pilots' salaries were also reduced after the bankruptcy, which contributed to the disparity.

[7]A target benefit plan is a type of defined contribution plan designed to emulate a defined benefit plan in that employer contributions are actuarially determined to achieve a targeted benefit, but where the individual employee carries the risk of any investment loss. Dan M. McGill et al., Fundamentals of Private Pensions 283 (8th ed. 2005), cited in *Nw. Airlines*, 594 F. Supp. 2d at 1081 n.5.

To calculate retirement benefits, the MP3 starts by employing a "stovepipe model" to project a hypothetical career with Northwest for each individual pilot in order to estimate the pilot's final average earnings at retirement. The stovepipe model assumes that each pilot retires at 60—the mandatory retirement age for pilots in effect at the time.[8] When a pilot retires, the model assumes that the next pilot with the highest seniority is promoted to replace the retired pilot, and that all other pilots are then promoted in the same step-wise manner. The model also assumes that the fleet size is static, openings are created solely by normal retirement, all pilots accept their promotions, and rates of pay will be increased each year by 1.5% from 2008–2010 and by 2.0% in 2011 and after. With these assumptions, the stovepipe model is able to calculate the projected final average earnings for each pilot.[9] The model was implemented as of December 31, 2007, and does not take into account any deviations from a pilot's projected career as compared to the pilot's actual experience.

Based on a pilot's age and years of service, the MP3 then calculates a "target percentage" of the pilot's projected final average earnings to be provided as a retirement benefit. A pilot's age and years of service as of December 31, 2007 are added together to determine a point value for that pilot, which corresponds to a table that provides the pilot's target percentage. The more points a pilot has, the higher the target percentage. Therefore, an older pilot with the same years of service as a younger pilot has a higher target percentage than the younger pilot.

---

[8]Congress subsequently raised the mandatory retirement age for pilots from 60 to 65. 49 U.S.C.A. § 44729(a) (West Supp. 2008). In doing so, Congress also expressly prohibited lawsuits based on actions taken before the enactment of the new law that were in conformance with the previous mandatory retirement age. *Id.* § 44729(e)(2).

[9]Projected final average earnings are calculated using the same averaging rules as the frozen Pension Plan—the average monthly compensation of the highest 60 months of earnings of the last 120 months prior to retirement.

The target percentage is then multipled by the projected final average earnings and a "service ratio" to determine the pilot's "gross target benefit." The service ratio is the pilot's projected total years of service at age 60 divided by 25. The number of years of service taken into account for the service ratio is also limited to 25.[10] Therefore, pilots who have worked with Northwest for at least 25 years when they retire will receive the full percentage of their final average earning—otherwise the pilot will receive less. The gross target benefit is expressed as a monthly lifetime payment beginning at age 60.

If a pilot accrued benefits under the frozen Pension Plan, those benefits are then subtracted from the pilot's gross target benefit to obtain the "net target benefit" (still expressed as a monthly payment). If a pilot's frozen Pension Plan benefits exceed the gross target benefit under the MP3, the pilot does not receive any contributions from the MP3, and will only have the frozen Pension Plan benefits. For pilots who do receive contributions under the MP3, in some cases those contributions are still less than they would have received under the pro rata to pay plan.

Finally, for pilots who receive contributions from the MP3, the net target benefit is converted into a lump sum value that is the estimated amount the pilot needs to have accumulated by the age of 60 to fund the net target benefit. The target contribution received by the pilot is then a semi-monthly contribution made until the earlier of the completion of 25 years of service or reaching age 60, which, together with an assumed investment return of 8%, will achieve the lump sum value.

In December 2007, Northwest filed a declaratory judgment action, requesting the district court to find that the MP3 complied with ERISA. The older Pilots, all of whom either receive no contributions under the MP3 or receive smaller contributions

---

[10]ADEA permits a plan to limit, without regard to age, the years of service taken into account for purposes of determining benefit accrual under the plan. *See* 29 U.S.C. § 623(i)(2).

than under the pro rata to pay plan, counterclaimed, arguing that the plan violated the ADEA, the parallel provisions of ERISA § 204(b)(2)(A) and ADEA § 4(i)(1)(B), and several state laws prohibiting age discrimination.[11] In November 2008, Northwest and the Pilots Association filed motions for judgment on the pleadings and summary judgment, arguing that the MP3 does not violate the parallel provisions of ERISA § 204(b)(2)(A) and ADEA § 4(i)(1)(B), that ADEA § 4(i)(4) precludes claims under ADEA § 4(a), (c), and that ERISA preempts the state-law claims. The district court granted Northwest's and the Pilots Association's motions for summary judgment. On appeal, the older Pilots argue that the MP3 improperly reduces or eliminates their retirement benefit payments because of age and that the district court improperly disregarded the declaration of one of their experts.[12]

## II. Discussion

This court reviews the grant of a motion for summary judgment de novo, and views all evidence most favorable to, and makes all reasonable inferences for, the nonmoving party. *Country Life Ins. Co. v. Marks*, 592 F.3d 896, 898 (8th Cir. 2010); Fed. R. Civ. P. 56(c). Summary judgment should be affirmed when there is no genuine issue of material fact and the appellee is entitled to judgment as a matter of law. *Coates v. Powell*, 639 F.3d 471, 475 (8th Cir. 2011).

---

[11]The older Pilots also argued that the Pilots Association breached its duty of fair representation. The district court subsequently granted the Pilots Association's motion to dismiss the duty of fair representation claim and it is not at issue in this appeal. *See Nw. Airlines, Inc. v. Phillips*, 758 F. Supp. 2d 786, 788 (D. Minn. 2010).

[12]The older Pilots do not challenge the district court's conclusion that compliance with ADEA § 4(i)(4) (noting that compliance with subsection 4(i) "shall constitute compliance with the requirements of this section relating to benefit accrual under such plan.") precludes their claims under ADEA § 4(a), (c) and, therefore, that argument is also not at issue in this appeal. *See Nw. Airlines*, 594 F. Supp. 2d at 1088.

## A. ADEA and ERISA

The older Pilots argue that the use of a pilot's projected final average earnings to determine contribution levels is "inextricably linked to age" and therefore violates the parallel provisions of ADEA and ERISA. ADEA § 4(i)(1)(B) makes it unlawful to maintain an employee pension benefit plan that permits "the cessation of allocations to an employee's account, or the reduction of the rate at which amounts are allocated to an employee's account, because of age." 29 U.S.C. § 623(i)(1)(B). ERISA § 204(b)(2)(A) states that a "defined contribution plan satisfies the requirements of this paragraph if, under the plan, allocations to the employee's account are not ceased, and the rate at which amounts are allocated to the employee's account is not reduced, because of the attainment of any age." *Id.* § 1054(b)(2)(A).

Congress enacted these two provisions as part of the 1986 Omnibus Budget Reconciliation Act (OBRA). OBRA prevents employers from discontinuing or reducing allocations to an employee's retirement account "on account of the attainment of a specified age" and "require[s] a plan to provide for benefit accruals and contributions with respect to an employee's years of plan participation after normal retirement age." H.R. Rep. No. 99-1012, at 276, 378 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 3868, 4021, 4023. The two provisions are parallel and Congress intended these subsections "to be interpreted in a consistent manner." H.R. Rep. No. 99-1012, at 378–79 (1986) (Conf. Rep.), *as reprinted in* 1986 U.S.C.C.A.N. 3868, 4023–24; *see also Hurlic v. S. Cal. Gas Co.*, 539 F.3d 1024, 1036 (9th Cir. 2008). Therefore, if the plan does not violate ADEA § 4(i)(1)(B), it does not violate ERISA § 204(b)(2)(A), and conversely, if it violates one, it violates them both. The court analyzes challenges under OBRA based on the structure and terms of the challenged plan. *See, e.g.*, *Hurlic*, 539 F.3d at 1029–32; *Hirt v. Equitable Ret. Plan for Emps., Managers, & Agents*, 533 F.3d 102, 107–10 (2d Cir. 2008).

The Supreme Court considered the application of ADEA to part of the structure of a retirement plan in *Kentucky Retirement Systems v. Equal Employment Opportunity Commission*, 554 U.S. 135 (2008). In that case, the EEOC challenged a portion of Kentucky's retirement plan that applied to workers such as police officers and firefighters. *Id.* at 139. Under the plan, employees were eligible for a pension after either attaining 20 years of service, or attaining 5 years of service and reaching the age of 55. *Id.* If a qualified worker became disabled before being eligible for normal retirement, the worker would receive a certain number of "imputed" years added to the employee's actual years of service. *Id.* "The number of imputed years equals the number of years that the disabled employee would have had to continue working in order to become eligible for normal retirement benefits . . . ." *Id.* However, if an employee became disabled after they had already reached the eligible age for retirement, 55, they received no imputed years of service. *Id.* at 140. For a subset of employees then, the retirement plan specifically took age into consideration. For example, "a 61-year-old officer or firefighter who is disabled in the same heroic action [as a younger officer] receives, in many instances, a lower payment and for one reason alone: By explicit command of Kentucky's disability plan age is an express disadvantage in calculating the disability payment." *Id.* at 152 (Kennedy, J., dissenting).

The Supreme Court still held that an employer who "adopts a pension plan that includes age as a factor, and that employer then treats employees differently based on pension status, a plaintiff, to state a disparate-treatment claim under the ADEA, must adduce sufficient evidence to show that the differential treatment was 'actually motivated' by *age,* not pension status." *Id.* at 148. The Court relied, in part, on the conclusion in a previous case that "as a matter of pure logic, age and pension status remain 'analytically distinct' concepts." *Id.* at 143 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993)).

In *Hazen Paper*, the Supreme Court addressed a disparate-treatment claim under the ADEA and examined the relationship between an employee's age and years of service. 507 U.S. at 606. A 62-year-old employee had over 9.5 years of service when he was dismissed. The employee argued that he was unlawfully terminated by his employer in order to avoid paying pension benefits that would have vested with 10 years of service. *Id.* at 606–08. The Court, noting that a younger employee could easily have more years of service than a recently hired older employee, concluded that "an employee's age is analytically distinct from his years of service." *Id.* at 611. And because age and years of service are distinct, "an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Id.* Similarly, the difference in treatment under the Kentucky plan turned on whether the employee had already qualified for a pension, and not directly on the employee's age.

In this case, the stovepipe model of the MP3 uses age to calculate a pilot's remaining years of service before the mandatory retirement age of 60. Given that promotion is largely determined by seniority status, the stovepipe model is able to estimate a pilot's promotions as older pilots hit the mandatory retirement age and each pilot moves up the ladder. This, in turn, produces an estimate of each pilot's final average earnings, calculated in the same manner as under the previous Pension Plan. The model also used the remaining years of service to estimate the number and amount of annual pay increases a pilot would receive before turning 60.

Under the MP3, the contributions of all of the pilots are based on their projected final average earnings, which cannot be calculated without the use of age. However, that does not mean that the older Pilots' contributions have been reduced *because of* their age. There are several factors in the MP3 that could reduce an older pilot's projected final average earnings, including seniority and flight/seat position at the start of the stovepipe calculation, the number of annual pay increases before retirement, and benefits acquired under the frozen Pension Plan. A younger pilot who remains

-10-

with Northwest until retirement will, by definition, receive more promotions and pay increases than an older pilot who is hired at the same time. As courts have noted in cases dealing with a different type of pension plan, nothing in OBRA indicates that "Congress set out to legislate against the fact that younger workers have (statistically) more time left before retirement, and thus a greater opportunity to earn interest on each year's retirement savings." *Cooper v. IBM Pers. Pension Plan*, 457 F.3d 636, 639 (7th Cir. 2006); *see also Hurlic*, 539 F.3d at 1031–32. "Treating the time value of money as a form of discrimination is not sensible." *Cooper*, 457 F.3d at 639. While promotions and pay increases are correlated with age, they are analytically distinct and, therefore, not reductions in contributions because of age.

Service ratio and the frozen Pension Plan offset also both contribute to potential differences in contributions, and are analytically distinct from age. Older pilots with only a few years of service will have their contributions significantly reduced by the service ratio when their total years of service are divided by 25. An employee's years of service is analytically distinct from the employee's age. *Hazen Paper Co.*, 507 U.S. at 611. At the other end of the spectrum, older pilots with a long service record have already accumulated significant benefits under the frozen Pension Plan. After the projected final average earnings is calculated and adjusted for the target percentage and service ratio, any monthly benefits accrued under the frozen Pension Plan are subtracted. That offset results in significantly lower, or no contributions under the MP3. However, in a very similar manner to *Kentucky Retirement Systems*, the Pension Plan offset is "differential treatment based on *pension status*, where pension status—with the explicit blessing of the ADEA—itself turns, in part, on age." 554 U.S. at 148. The reductions due to the service ratio and offset are not reductions "because of age."

Finally, none of the rationale for the MP3 touches on any of the "sorts of stereotypical assumptions that the ADEA sought to eradicate." *Ky. Ret. Sys.*, 554 U.S. at 146. The MP3 was put in place to avoid an unwarranted discrepancy in the amount

of employer paid benefits between older and younger employees that would have resulted if the company had provided pilots contributions that were the same percentage of their pay. Older employees would have received much more overall because they retained a significant contribution from the frozen Pension Plan. As in the Kentucky Plan, "[i]t does not rest on any stereotype about the work capacity of 'older' workers relative to 'younger' workers." *Id.*

## B. Expert Testimony

The older Pilots also argue that the district court improperly disregarded the declaration of one of the older Pilots' experts and should have applied the generally-accepted test for the admissibility of expert testimony first articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The district court concluded that the older Pilots' experts "do not aid the [district court] because they do little more than show a negative correlation between age and allocations under the MP3."

First, the district court did not exclude the evidence provided by the expert; therefore the *Daubert* test is not applicable. The district court considered the declaration, but found it was conclusory and did not aid the court. Conclusory expert testimony is not sufficient to defeat a motion for summary judgment. *Herrero v. St. Louis Univ. Hosp.*, 109 F.3d 481, 485 (8th Cir. 1997). Second, we review the grant of motions for summary judgment de novo, and in reviewing the record anew we give no deference to determinations made by the trial judge. *See Country Life Ins. Co.*, 592 F.3d at 898 (summary judgment standard of review); *Black's Law Dictionary* 924 (9th ed. 2009).

The declaration notes a correlation between age and projected final average earnings. However, correlation is not causation and, as discussed above, remaining years of service and final average earnings are analytically distinct from age under

controlling Supreme Court precedent. In addition, the declaration fails to explain how several of the proffered arguments would actually have a greater impact on older pilots, such as not including the increased mandatory retirement age of 65 and not adjusting contributions for actual earnings. A careful consideration of the declaration, along with the rest of the record, does not alter the above analysis.

## III. Conclusion

For the foregoing reasons, we hold the MP3 does not reduce the older Pilots' benefits because of age. Accordingly, we affirm the judgment of the district court.

_____