In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2860

VULCAN CONSTRUCTION MATERIALS, L.P.,

*Petitioner*,

*v.*

FEDERAL MINE SAFETY AND HEALTH
REVIEW COMMISSION, et al.,

*Respondents*.

Petition for Review of an Order of
the Federal Mine Safety and Health Review Commission.
No. LAKE 2011-327-DM

ARGUED FEBRUARY 10, 2012—DECIDED OCTOBER 25, 2012

Before RIPPLE and ROVNER, *Circuit Judges*, and
COLEMAN, *District Judge*.[*]

RIPPLE, *Circuit Judge*. On December 2, 2010, Peter L.
Dunne filed a discrimination complaint pursuant to

---

[*] The Honorable Sharon Johnson Coleman, of the United States
District Court for the Northern District of Illinois, sitting by
designation.

30 U.S.C. § 815(c)(2), with the Mine Safety and Health Administration ("MSHA"), a division of the Department of Labor. He alleged that Vulcan Industries, L.P. ("Vulcan") had terminated his employment for engaging in safety-related activity protected under 30 U.S.C. § 815(c)(1). The Secretary of Labor determined that Mr. Dunne's complaint was not frivolously brought, and Vulcan agreed to a temporary (economic) reinstatement of Mr. Dunne pending a determination on the merits of Mr. Dunne's complaint. The Secretary later determined not to prosecute Mr. Dunne's complaint before the Federal Mine Safety and Health Review Commission ("FMSHRC" or "Commission"), and Vulcan moved to dissolve the reinstatement order. The Commission denied Vulcan's motion, and Vulcan sought review in this court. For the reasons set forth in the following opinion, we grant Vulcan's petition and reverse the judgment of the Commission.

# I

## BACKGROUND

The facts are not in dispute. Mr. Dunne filed a discrimination complaint with the MSHA, alleging that his former employer, Vulcan, had discharged him for engaging in safety-related activity protected under 30 U.S.C. § 815(c)(1). The Secretary initially determined that Mr. Dunne's complaint was not frivolously brought; she sought, and Vulcan agreed to, a temporary economic reinstatement of Mr. Dunne.

After conducting her investigation, the Secretary concluded that no discrimination had occurred and notified Mr. Dunne of this determination. Mr. Dunne subsequently filed his own discrimination action before the Commission pursuant to 30 U.S.C. § 815(c)(3). Vulcan then moved to dissolve the reinstatement order. The Secretary filed an opposition, and the administrative law judge ("ALJ") assigned to the case denied the motion.

On July 7, 2011, Vulcan filed with the Commission a petition for discretionary review of the ALJ's denial of its motion. On July 14, 2011, the Commission granted the petition, and a divided Commission affirmed the ALJ's denial of the motion to dissolve the temporary reinstatement order. Each of the Commissioners adopted the same position that he or she had taken in *Secretary of Labor ex rel. Gray v. North Fork Coal Corp.*, 33 FMSHRC 27 (Jan. 2011): Commissioners Jordan and Nakamura believed that the plain language of 30 U.S.C. § 815(c) required the reinstatement order to remain in place; Commissioner Cohen believed that the language of the statute was ambiguous, but that the Secretary's position on the issue—that the reinstatement order should remain in place—deserved deference; and Commissioners Duffy and Young believed that the plain language of § 815(c) required that the reinstatement order be dissolved.

Vulcan timely sought review of the Commission's decision in this court.

## II

## DISCUSSION

### A. Jurisdiction

The Commission had jurisdiction over this matter pursuant to 30 U.S.C. § 823(d). Although we have jurisdiction over final orders of the Commission, *see* 30 U.S.C. § 816, the order with respect to temporary reinstatement is not a final order. The parties maintain, however, that we have jurisdiction over Vulcan's appeal under the collateral order doctrine.

> To come within this narrow exception, [an] order must, at a minimum, meet three conditions. First, it must conclusively determine the disputed question; second, it must resolve an important issue completely separate from the merits of the action; third, it must be effectively unreviewable on appeal from a final judgment.

*Flanagan v. United States*, 465 U.S. 259, 265 (1984) (internal quotation marks omitted) (citations omitted). These criteria are met here. The Commission conclusively determined that Mr. Dunne's temporary reinstatement should not be dissolved during the pendency of his proceeding under § 815(c)(3). Whether the temporary reinstatement order should be dissolved is a matter of statutory interpretation, completely separate from the merits of Mr. Dunne's discrimination claim. Finally, any appeal on the merits of Mr. Dunne's complaint would not need to reach this issue, effectively depriving Vulcan of "any opportunity for a judicial

hearing" on the temporary reinstatement issue. *Jim Walter Res., Inc. v. Fed. Mine Safety & Health Review Comm'n ex rel. Price*, 920 F.2d 738, 745 (11th Cir. 1990). Consequently, we proceed to the substance of Vulcan's arguments with respect to the temporary reinstatement issue.

**B.  Statutory Language and History**

**1.**

In this case, the parties dispute the unambiguous meaning of Section 815(c) of Title 30, a provision of the Federal Mine Safety and Health Act of 1977 ("FMSHA" or "Act"), which provides in relevant part:

> (c) Discrimination or interference prohibited; complaint; investigation; determination; hearing
>
> (1) No person shall discharge or in any manner discriminate against or . . . otherwise interfere with the exercise of the statutory rights of any miner, representative of miners or applicant for employment in any coal or other mine . . . because such miner, representative of miners or applicant for employment has filed or made a complaint under or related to this chapter . . . .
>
> (2) Any miner or applicant for employment or representative of miners who believes that he has been discharged, interfered with, or otherwise discriminated against by any person in violation of this subsection may, within 60 days after such

violation occurs, file a complaint with the Secretary alleging such discrimination. Upon receipt of such complaint, the Secretary shall forward a copy of the complaint to the respondent and shall cause such investigation to be made as he deems appropriate. Such investigation shall commence within 15 days of the Secretary's receipt of the complaint, and if the Secretary finds that such complaint was not frivolously brought, the Commission, on an expedited basis upon application of the Secretary, shall order the immediate reinstatement of the miner *pending final order on the complaint*. If upon such investigation, the Secretary determines that the provisions of this subsection have been violated, he shall immediately file a complaint with the Commission, with service upon the alleged violator and the miner, applicant for employment, or representative of miners alleging such discrimination or interference and propose an order granting appropriate relief. The Commission shall afford an opportunity for a hearing . . . and thereafter shall issue an order, based upon findings of fact, affirming, modifying, or vacating the Secretary's proposed order, or directing other appropriate relief. Such order shall become final 30 days after its issuance. The Commission shall have authority in such proceedings to require a person committing a violation of this subsection to take such affirmative action to abate the violation as the Commission deems appropriate, including,

but not limited to, the rehiring or reinstatement of the miner to his former position with back pay and interest. The complaining miner, applicant, or representative of miners may present additional evidence on his own behalf during any hearing held pursuant to this paragraph.

(3) Within 90 days of the receipt of a complaint filed under paragraph (2), the Secretary shall notify, in writing, the miner[] . . . of his determination whether a violation has occurred. If the Secretary, upon investigation, determines that the provisions of this subsection have not been violated, the complainant shall have the right, within 30 days of notice of the Secretary's determination, to file an action in his own behalf before the Commission, charging discrimination or interference in violation of paragraph (1). The Commission shall afford an opportunity for a hearing . . ., and thereafter shall issue an order, based upon findings of fact, dismissing or sustaining the complainant's charges and, if the charges are sustained, granting such relief as it deems appropriate, including, but not limited to, an order requiring the rehiring or reinstatement of the miner to his former position with back pay and interest or such remedy as may be appropriate. Such order shall become final 30 days after its issuance. Whenever an order is issued sustaining the complainant's charges under this subsection, a sum equal to the aggregate amount of all costs and expenses (including attorney's

fees) as determined by the Commission to have been reasonably incurred by the miner, applicant for employment or representative of miners for, or in connection with, the institution and prosecution of such proceedings shall be assessed against the person committing such violation.

30 U.S.C. § 815(c) (emphasis added) (footnote omitted).

Although the parties disagree with respect to how this section, specifically the phrase "final order on the complaint" in subsection (c)(2), should be interpreted, they rely on much of the same statutory and interpretive history in making their arguments. An understanding of the statute's purpose and history, therefore, is helpful in analyzing the parties' positions.

**2.**

Following a number of "tragic mining disasters" in the 1970s, Congress conducted a comprehensive examination of the then-existing laws governing our nation's mines and the miners who worked in them. S. Rep. No. 95-181 at 4 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3404. That examination revealed a number of shortcomings that Congress sought to remedy with new legislation. For example, existing law (1) "d[id] not provide effective protection for miners from health and safety hazards and enforcement sanctions under [that law] [we]re insufficient to encourage compliance by operators"; (2) did not vest "enforcement of safety and health laws" with "agencies which are generally responsible for the

needs of workers"; and (3) contained insufficient "enforcement sanctions . . . to deal with chronic violators." *Id.* at 8, *reprinted in* 1977 U.S.C.C.A.N. at 3408.

To remedy these shortcomings, Congress transferred to the Secretary of Labor "[a]ll functions and responsibilities . . . in the area of mine safety and health." *Id.* at 11, *reprinted in* 1977 U.S.C.C.A.N. at 3411. The Secretary was authorized to establish safety standards, and the newly created, "independent Mine Safety and Health Review Commission [wa]s established to review orders, citations, and penalties" issued by the Secretary. *Id.* The Commission was not imbued with rule-making authority, but instead was to "serve[] as the ultimate administrative review body for disputed cases arising under the new mine safety act." *Id.* at 13, *reprinted in* 1977 U.S.C.C.A.N. at 3413.

With respect to the complaint procedure at issue here, legislators noted that,

> [i]f our national mine safety and health program is to be truly effective, miners will have to play an active part in the enforcement of the Act. The Committee is cognizant that if miners are to be encouraged to be active in matters of safety and health, they must be protected against any possible discrimination which they might suffer as a result of their participation. The Committee is also aware that mining often takes place in remote sections of the country, and in places where work in the mines offers the only real employment opportunity.

> . . . [T]he bill prohibits any discrimination against a miner for exercising any right under the Act. It should also be noted that the class protected is expanded from the current Coal Act. . . . The Committee intends that the scope of the protected activities be broadly interpreted by the Secretary, and intends it to include not only the filing of complaints seeking inspection . . . or the participation in mine inspections . . ., but also the refusal to work in conditions which are believed to be unsafe or unhealthful and the refusal to comply with orders which are violative of the Act or any standard promulgated thereunder, or the participation by a miner or his representative in any administrative and judicial proceeding under the Act.

*Id.* at 35, *reprinted in* 1977 U.S.C.C.A.N. at 3435. The complaint procedure, therefore, serves an important function in accomplishing the legislation's broader goals of improving mine safety and protecting miners.

The legislative history does not speak directly to the issue raised by the parties—how long a temporary reinstatement order should remain in effect. Nevertheless, it does note the importance of temporary reinstatement in the overall remedial scheme:

> Upon determining that the complaint appears to have merit, the Secretary shall seek an order of the Commission temporarily reinstating the complaining miner pending final outcome of the investigation and complaint. The Committee feels that this temporary reinstatement is an es-

sential protection for complaining miners who may not be in the financial position to suffer even a short period of unemployment or reduced income pending resolution of the discrimination complaint. To further expedite the handling of these cases, the section requires that upon completion of the investigation and determination that the provisions of this section have been violated, the Secretary must immediately petition the Commission for appropriate relief.

*Id.* at 36-37, *reprinted in* 1977 U.S.C.C.A.N. at 3436-37.

**3.**

Although the FMSHA was enacted in 1977, the issue of when a temporary reinstatement order expires did not arise until recently. Shortly after the passage of the Act, the Commission adopted "Rules of Procedure," which included the following: "If, following an order of reinstatement, the Secretary determines that the provisions of section 105(c)(1)[1] have not been violated, the Judge shall be so notified and shall enter an order dissolving the order of reinstatement." 29 C.F.R. § 2700.44 (1980). The rule remained in effect until 2006. During this time, the Secretary apparently did not contest the Commission's interpretation.

In October 2004, the Commission solicited comments on changes that should be made to its procedural rules. In response,

---

[1] Section 105(c) of the Act corresponds to 30 U.S.C. § 815(c).

> [t]he Secretary . . . suggested that Commission Procedural Rule 45(g) be amended to provide that once temporary reinstatement is ordered, absent agreement of the parties, the order of temporary reinstatement shall remain in effect until there is a final decision on the merits of the miner's complaint of discrimination even when the Secretary determines that there was no violation of section 105(c) of the Mine Act.

*Rules and Regulations, Federal Mine Safety and Health Review Comm'n*, 71 Fed. Reg. 44,190, 44,198 (Aug. 4, 2006) (to be codified at 29 C.F.R. pts. 2700, 2704, 2705). According to the Secretary, the practice of dissolving the order was "at odds with the meaning of section 105(c)(2)." *Id.* She believed that § 815(c)(2) "require[d] that the temporary reinstatement order remain in effect until the underlying discrimination complaint is resolved regardless of whether the complaint of discrimination is litigated by the Secretary under section 105(c)(2) of the Act or whether it is litigated by the miner under section 105(c)(3) of the Act." *Id.* The Commission, however, "declined . . . to revise Procedural Rule 45(g) in the manner suggested by the Secretary" because it "ha[d] not decided the issue of whether a temporary reinstatement order remains in effect during a miner's pursuit of his or her discrimination complaint . . . under section 105(c)(3)." *Id.* The Commission stated that the issue raised by the Secretary's comment "[wa]s more appropriately addressed in the context of litigation rather than rulemaking." *Id.*

The Commission subsequently received comments requesting further revision to Procedural Rule 45(g), including a comment that reiterated the suggestion previously made by the Secretary. The Secretary, however, no longer urged the Commission to adopt her original proposal, but "agreed with the Commission's conclusion . . . that the issue of *whether a temporary reinstatement order remains in effect during a miner's pursuit of his or her discrimination complaint under section 105(c)(3) would best be resolved in the context of litigation*." *Id.* at 44,198-99 (emphasis added). Nevertheless, the Secretary made the point that the "current Procedural Rule 45(g) appear[ed] to address the issue and resolve it in the negative: That is, that a Judge's reinstatement order should not remain in effect pending a miner's discrimination complaint under section 105(c)(3)." *Id.* at 44,199. The Secretary therefore requested that the Commission delete the language in Procedural Rule 45(g), requiring the dissolution of the temporary reinstatement order when the Secretary determined that the provisions of § 815(c)(1) had not been violated. *See id.* at 44,199. The Commission "agree[d] with the Secretary," deleted the language from the rule and "le[ft] open for litigation the issue of whether an order for temporary reinstatement remains in effect pending a miner's discrimination complaint under section 105(c)(3) of the Mine Act." *Id.* The current version of the rule states:

> (g) *Dissolution of order*. If, following an order of temporary reinstatement, the Secretary determines that the provisions of section 105(c)(1), 30 U.S.C. 815(c)(1), have not been violated, the

Judge shall be so notified. An order dissolving the order of reinstatement shall not bar the filing of an action by the miner in his own behalf under section 105(c)(3) of the Act, 30 U.S.C. 815(c)(3), and § 2700.40(b) of these rules.

29 C.F.R. § 2700.45(g).

**4.**

After the Commission adopted the current version of Rule 45(g), the Secretary began advocating, in the course of administrative proceedings, the preservation of reinstatement orders pending the resolution of a miner's action under § 815(c)(3). The issue came before the Commission in 2008 in *Phillips v. A & S Construction Co.*, 31 FMSHRC 975 (Sept. 2009). In that case, an ALJ had dissolved a temporary reinstatement order pending resolution of a miner's action under § 815(c)(3). The Secretary appealed the decision. Commissioners Duffy and Young voted to affirm the ALJ's dissolution order. According to those commissioners, the plain meaning of § 815(c)(3) required dissolution of the temporary re-instatement order upon the Secretary's finding that no violation had occurred. The commissioners wrote:

> Reading section 105(c)(2) in context, we conclude that the provision that a temporary reinstatement order remains in effect "pending final order on the complaint" clearly refers to the "complaints" filed under section 105(c)(2) and does not extend to the miner's "action" filed under section

105(c)(3). We base this conclusion on the usage of the term "complaint" in sections 105(c)(2) and 105(c)(3).

. . . .

The legitimacy of the miner's complaint is determined by the Secretary in a two-phased process. First, the Secretary determines whether the miner's complaint has been "frivolously brought" through an initial investigation. 30 U.S.C. § 815(c)(2). If the complaint is not frivolous, the Secretary files an application with the Commission to temporarily reinstate the miner. *Id.* The standard of the initial determination, which requires only that a miner's complaint must appear to have merit, is set low so that a miner may be reinstated while the Secretary conducts a more thorough investigation. Second, if, after further investigation, the Secretary determines that a violation of section 105(c) has occurred, the Secretary files a complaint with the Commission on the miner's behalf, which validates the initial finding of non-frivolousness and the miner's initial complaint of discrimination. In such circumstances, the Secretary is acting on the miner's complaint, which has merged with the Secretary's complaint. Temporary reinstatement continues until there is a final order on the miner's complaint as advanced by the Secretary in the section 105(c)(2) proceeding.

This contrasts with the terms of section 105(c)(3). Under that section, if the Secretary, upon investiga-

tion, determines that section 105(c)(1) has not been violated, the miner has the right to file a new, separate "action" charging discrimination with the Commission. Section 105(c)(3) also describes the time within which the Secretary must notify the miner of that negative determination as being within 90 days after the receipt "of a complaint filed under paragraph (2)." 30 U.S.C. § 815(c)(3). We conclude that Congress's reference to the documents filed under section 105(c)(2) as "complaints" and to the filing of an "action" under section 105(c)(3) was intentional. Therefore, based on the plain language of sections 105(c)(2) and (c)(3), a temporary reinstatement order remains in effect pending final order on the miner's complaint as advanced by the Secretary under section 105(c)(2), but does not extend to the pendency of an action under section 105(c)(3).

*Id.* at 980-81 (plurality opinion) (footnote omitted) (additional citations omitted). The commissioners also believed that Congress's use of the term "final order" led to the conclusion that temporary reinstatement should end once the Secretary had determined not to go forward with the complaint. *Id.* at 982. They observed that "the term 'order' is used in section 105(c) to refer to action by the Commission." *Id.* at 981. Consequently, they concluded:

Considering the language discussed above regarding what is meant by "complaint," with the language regarding what is meant by "final

order," we conclude that a temporary reinstatement order remains effective pending the final order of the Commission on a complaint filed under section 105(c)(2). Therefore, if the Secretary determines that there has been no discrimination, the temporary reinstatement order would cease to be effective, and the judge should issue an order dissolving the temporary reinstatement and dismissing the temporary reinstatement proceeding. If the Secretary determines that there has been discrimination and files a complaint on the miner's behalf, the temporary reinstatement order would remain in effect until the judge's decision disposing of the merits of the complaint, or the Commission's decision or court's decision, in the event of appeal, becomes final by the passage of 30 days.

*Id.* at 982 (footnote omitted).

Because they believed that the language of the statute was unambiguous, Commissioners Duffy and Young did not need to consider what level of deference was owed to the Secretary's position. Nevertheless, they noted that they "fail[ed] to see how the Secretary is owed deference on the question of whether temporary reinstatement should continue after the Secretary has made a determination of no discrimination. . . . The Secretary, by declining to pursue a miner's claim of discrimination, essentially remove[d] herself from the case." *Id.* at 987.

Commissioner Jordan disagreed with the plurality's analysis. She believed that, "in accordance with the

plain meaning of the statute, there is no 'final order on the complaint' until the Commission issues an order which either affirms, modifies, or vacates the Secretary's proposed order" under § 815(c)(2) "or dismisses or sustains the complainant's charges" under § 815(c)(3). *Id.* at 991 (Jordan, Comm'r, dissenting). Commissioner Jordan was not persuaded that Congress's use of different terms in § 815(c)(2) (complaint) and § 815(c)(3) (action) meant that temporary reinstatement lasted only as long as proceedings under § 815(c)(2). She noted that, although § 815(c)(3) "refers to an 'action' before the Commission, the person who files this action is referred to as the 'complainant.'" *Id.* at 993 (quoting 29 U.S.C. § 815(c)(3)) (emphasis omitted). Commissioner Jordan believed that the use of the term "'complainant' [wa]s an acknowledgment that the proceeding under section 105(c)(3) involve[d] the same alleged discriminatory conduct that prompted the miner's complaint to the Secretary under section 105(c)(2)." *Id.*

The final member of the Commission,[2] Commissioner Cohen, took yet another view. He voted to reverse the ruling of the ALJ with respect to temporary reinstatement, but on the ground that the statute was ambiguous, and the Commission should defer to the Secretary's position. He observed that the Commission itself had recognized that Congress had not spoken to the

---

[2] At the time *Phillips v. A & S Construction Co.*, 31 FMSHRC 975 (Sept. 2009), was decided, there was an open seat on the Commission and, consequently, only four sitting Commissioners.

issue and thus had adopted Rule 45(g) as a gap-filling measure:

> [F]ormer Commission Procedural Rule 45(g), 29 C.F.R. § 2700.45(g) (1999), permitted the dissolution of a temporary reinstatement order upon the Secretary's decision not to proceed on the complaint. The Commission has described this as "a 'gap filling' provision designed to deal with a situation *not addressed* by the statute—the status of a temporary reinstatement order following a determination by the Secretary that there has been no violation of section 105(c)." *Sec'y of Labor on behalf of Bernardyn v. Reading Anthracite Co.*, 21 FMSHRC 947, 949-50 (Sept. 1999) (emphasis added). I fail to see how the statutory language can be considered plain when we have acknowledged that it pertained to a situation that Congress did not address.

*Id.* at 1002 (Cohen, Comm'r, dissenting). He believed that his fellow commissioners' refusal to defer to the Secretary was based on an "unnecessarily restrictive view of the Secretary's role under the Mine Act":

> The fact that the Secretary has determined that a miner has not demonstrated discrimination in a particular case does not change the Secretary's interest in ensuring that miners who file section 105(c)(3) actions are entitled, as a class, to continued temporary reinstatement until a final order of the Commission. Because "enforcement of the [Mine] Act is the sole responsibility of the Secre-

tary," *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 161 (D.C. Cir. 2006), she has an interest in ensuring that section 105(c) is interpreted in an expansive manner, as vigorous protection for miners who make safety complaints (such as the complaint in this case, regarding miners operating equipment while under the influence of alcohol, S. Br. at 3). . . . The unfettered right of miners to complain about safety issues without fear of economic penalty strengthens the Secretary's ability to effectively enforce the Act.

*Id.* at 1003.

Less than two years after *Phillips*, the Commission revisited the issue in *Secretary of Labor ex rel. Gray v. North Fork Coal Corp.*, 33 FMSHRC 27 (Jan. 2011). By this time, the open seat on the Commission had been filled. Newly appointed Commissioner Nakamura joined in Commissioner Jordan's view that the plain language of § 815(c) required that temporary reinstatement continue after the Secretary determined that no violation had occurred, and during the miner's litigation before the Commission pursuant to § 815(c)(3). *See id.* at 33-42. Commissioner Cohen concurred on the same basis as he had articulated in *Phillips*. Commissioners Duffy and Young, now in dissent, maintained that the plain language of the statute commanded a different reading than that adopted by the plurality and the Secretary. *See id.* at 53-57.

## C. The Parties' Plain Meaning Arguments

Both Vulcan and the Secretary are of the view that, looking only at the unambiguous language of the statute, their respective interpretations should carry the day. We turn first to Vulcan's arguments.

### 1.

Vulcan believes that the term "complaint" in the phrase "final order on the complaint," refers only to the complaint brought by the Secretary after she determines that § 815(c) has been violated. Vulcan's argument rests on Congress's use of the term "complaint" as well as the structure of § 815(c). With respect to terminology, Vulcan notes that Congress uses the same term, "complaint," to describe both the means by which a miner raises an issue of discrimination before the Secretary and the means by which the Secretary pursues relief on behalf of the miner before the Commission: The miner "file[s] a *complaint* with the Secretary," and the Secretary "file[s] a *complaint* with the Commission." 30 U.S.C. § 815(c)(2) (emphasis added). Congress, however, uses a different word, "action," in describing how the miner seeks redress on his own behalf before the Commission: "If the Secretary, upon investigation, determines that the provisions of this subsection have not been violated, the complainant shall have the right . . . to file *an action* in his own behalf before the Commission . . . ." *See* 30 U.S.C. § 815(c)(3) (emphasis added). Indeed, Vulcan correctly points out that the term "complaint" is entirely absent from § 815(c)(3).

Turning to Vulcan's structural argument, it observes that, in subsections (c)(2) and (c)(3) of § 815, Congress sets forth two different avenues of redress for a miner's complaint of safety-related discrimination. The focus of § 815(c)(2) is the Secretary's prosecution of a complaint before the Commission. Those proceedings begin with the filing of a complaint by a miner, after which the Secretary must commence an investigation within fifteen days. If the Secretary finds that the complaint was not frivolously brought, the Secretary shall seek, and the Commission shall order, an immediate reinstatement "pending final order on the complaint." 30 U.S.C. § 815(c)(2). If the Secretary, through the course of her investigation, determines that there has been a violation, the Secretary shall file "a complaint" with the Commission alleging such discrimination and proposing an order granting appropriate relief. *Id.* The Commission then must hold a hearing and issue an order affirming, modifying or vacating the proposed order. The order becomes final thirty days after it has issued. In sum, § 815(c)(2) describes a process of redress in which the Secretary is involved, either as an investigator or an advocate.

Vulcan argues that, in contrast, § 815(c)(3) picks up the process at the point that the Secretary's involvement ends. It provides that, within 90 days of receipt of the complaint, the Secretary must notify the complainant if a violation has occurred. If the Secretary determines that a violation has not occurred, "the complainant shall have the right . . . to file *an action* in his own behalf before the Commission." 30 U.S.C. § 815(c)(3) (emphasis added).

The Commission then shall afford the opportunity for a hearing, after which it will issue an order dismissing or sustaining the charges.

Vulcan correctly notes that Congress placed the temporary reinstatement provision in § 815(c)(2) and that § 815(c)(3) is completely silent on the subject. According to Vulcan, the placement of the temporary reinstatement provision in the same subsection that describes the Secretary's investigation, merits determination and complaint, suggests that Congress meant for temporary reinstatement to continue only during the Secretary's involvement.

**2.**

The Secretary, on behalf of Mr. Dunne, takes the position that the "final order on the complaint" is the Commission's final ruling on the merits of the miner's safety complaint, whether it has been pursued by the Secretary or whether the miner has pursued his own action. Turning first to the phrase "final order," the Secretary observes that, throughout § 815(c), Congress only employs the term "final order" with respect to actions taken by the Commission. By contrast, in describing the Secretary's actions, Congress uses the terms "determines" and "determination." *See* 30 U.S.C. § 815(c)(2) & (3). Consequently, the Secretary's own determination not to pursue the miner's complaint before the Commission cannot be considered a "final order" that signals the end of temporary reinstatement. *Id.* § 815(c)(2).

The Secretary also maintains that Congress's use of the term "the complaint," when read in context, must refer to the miner's complaint. Prior to the reinstatement provision, the only "complaint" mentioned in the statutory text is that filed by the miner with the Secretary. Section 815(c)(2) of Title 30 states that "[a]ny miner . . . may[] . . . file a complaint with the Secretary alleging such discrimination." It also provides that, "[u]pon receipt of *such* complaint, the Secretary shall forward a copy to the respondent" and also begin an investigation. *Id.* (emphasis added). The statute then provides that "[s]uch investigation shall commence within 15 days of the Secretary's receipt of *the complaint*." *Id.* (emphasis added). Finally, "if the Secretary finds that such complaint was not frivolously brought, the Commission, on an expedited basis upon application of the Secretary, shall order the immediate reinstatement of the miner pending final order on *the complaint*." *Id.* (emphasis added). Thus, because the only complaint mentioned prior to the reinstatement provision is the miner's initial complaint before the Secretary, the reinstatement provision must be referring to the miner's complaint when it employs that term.

Additionally, the Secretary notes, every sentence of § 815(c)(2) preceding the temporary reinstatement provision refers back to the miner's complaint by use of the term "such complaint" or "the complaint." *Id.* The temporary reinstatement provision, therefore, must be referring to the final order on the *miner's* complaint.

Finally, the Secretary points out that, when speaking about the duration of the reinstatement order, Congress

uses the definite article "the" with "complaint." 30 U.S.C. § 815(c)(2) ("[T]he Commission, shall order the immediate reinstatement of the miner pending final order on *the* complaint." (emphasis added)). However, when Congress continues to describe the Secretary's actions after temporary reinstatement is secured, Congress states that the Secretary shall file "*a* complaint." *Id.* (emphasis added). The fact that Congress used the indefinite article, the Secretary continues, shows that "Congress intended the Secretary's complaint to be viewed as something different than the miner's underlying complaint." Appellee's Br. 22. Consequently, the Secretary concludes that, regardless whether *the* complaint is pursued by the Secretary or pursued by the miner through an action on his own behalf, the temporary reinstatement order should not be dissolved until the miner's underlying complaint is resolved.

### 3.

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Evaluating the language of the temporary reinstatement provision, not in isolation, but in the broader context of § 815(c), we believe that the unambiguous language of the statute requires that temporary reinstatement end when the Secretary's involvement ends.

Turning first to the language employed by Congress, we believe that it is significant that Congress chose the same term—"complaint"—to describe both the miner's means of redress before the Secretary and the Secretary's means of redress (on the miner's behalf) before the Commission. Congress, however, chose a different term—"action"—to describe a miner's means of redress before the Commission on his own behalf. We presume that Congress's choice of language was deliberate. *See Russello v. United States*, 464 U.S. 16, 23 (1983).

Additionally, Congress tied the temporary reinstatement provision to the Secretary's investigation and preliminary findings. The temporary reinstatement provision states:

> Such investigation shall commence within 15 days of the Secretary's receipt of the complaint, and *if the Secretary finds that such complaint was not frivolously brought*, the Commission, on an expedited basis upon application of the Secretary, shall order the immediate reinstatement of the miner pending final order on the complaint.

30 U.S.C. § 815(c)(2) (emphasis added). Once the Secretary concludes that the complaint has no merit, therefore, the temporary reinstatement should come to an end. Indeed,

> [i]t is difficult to understand why Congress would favor reinstatement *after* the Secretary has found the miner's complaint to lack merit. It is one thing to require a coal company to continue to

employ a miner after the Secretary determines
that the discrimination complaint was not frivo-
lously filed. It is quite another to do so after the
Secretary determines that the complaint has no
merit. It is quite possible, indeed, that the Secre-
tary's investigation will uncover not just that
the complaint is meritless but that it is frivolous
to boot, making it exceedingly odd to pre-
serve the reinstatement even after the body
given authority over this threshold determina-
tion finds that it no longer exists.

*N. Fork Coal Co. v. Fed. Mine Health & Safety Review
Comm'n*, 691 F.3d 735, 746 (6th Cir. 2012) (Sutton, J.,
concurring).

Moreover, Congress placed the temporary reinstate-
ment provision in § 815(c)(2), which sets forth the pro-
ceedings in which the Secretary is most actively involved.
There is no mention of temporary reinstatement, or even
a "complaint," in § 815(c)(3), which is dedicated to ex-
plaining how a miner proceeds on his own behalf once
the Secretary's involvement has ended. "Once again,
we presume that this choice in statutory structure was
intentional, indicating that temporary reinstatement is
not appropriate when a miner pursues an individual
'action' under § 815(c)(3)." *Id.* at 743 (majority opinion).

In short, Congress

described the two proceedings in different ways
(complaint versus action), directed the miner to
file them in different places (the Secretary versus
the Commission), explained that they were filed

for different purposes (for the Secretary's investigation versus on the miner's own behalf for the Commission's resolution) and mentioned reinstatement in one place but not in the other. Different words in different places mean different things.

*Id.* at 746 (Sutton, J., concurring). We conclude, therefore, that, based on the language Congress employed, the connection Congress drew between the Secretary's investigation and temporary reinstatement, and Congress's placement of the temporary reinstatement provision in § 815(c)(2) (especially when combined with Congress's silence with respect to temporary reinstatement in § 815(c)(3)), the temporary reinstatement provision ends when the Secretary's involvement ends.

**4.**

We find unpersuasive the Secretary's arguments that the plain meaning of the statute renders a contrary result. The Secretary first relies on Congress's use of the definite article—"the"—when describing the complaint in the temporary reinstatement provision compared with its use of the indefinite article—"a"—when describing a complaint by the Secretary before the Commission. According to the Secretary, the choice of different articles evidences that, with respect to the first phrase, Congress was referring to resolution of the *miner's* complaint, as opposed to final resolution of the *Secretary's* complaint under subsection (c)(2). We believe it of far greater import, however, that Congress employs *the same*

*term*—"complaint"—throughout § 815(c)(2). This is especially true given Congress's choice of different wording—"action"—to describe when the miner takes control of redressing the alleged wrongdoing.

The Secretary next maintains that "[t]he only 'complaint' referred to in Section 105(c)(2) preceding the phrase 'pending final order on the complaint' is the miner's underlying complaint. . . . Thus, the term 'the complaint' in the phrase 'pending final order on the complaint' plainly refers to the miner's underlying complaint." Appellee's Br. 21. Read in isolation, the Secretary's interpretation is plausible, but ignores the remainder of § 815(c)(2) and § 815(c)(3). When we consider (1) that the temporary reinstatement provision is placed within § 815(c)(2), (2) that § 815(c)(2) focuses on the Secretary's involvement in redressing retaliation complaints, (3) that the term Congress employed for the Secretary's means of redress on behalf of the miner also is "complaint" and (4) that § 815(c)(3) employs completely different terminology, we believe it is clear that Congress meant for the term to encompass both the miner's complaint before the Secretary and the Secretary's complaint on behalf of the miner before the Commission. That is, we believe that Congress meant to convey that the temporary reinstatement order lasts only as long as the proceedings governed by § 815(c)(2).

The Secretary argues as well that Congress's use of the term "complainant" in § 815(c)(3) suggests that Congress is referring to the miner's complaint in the temporary reinstatement provision and that the miner's

complaint survives beyond the Secretary's involvement detailed in § 815(c)(2). *See* Appellee's Br. 23. The Secretary's interpretation is not illogical, but would be more persuasive if Congress had not used a different term to refer to the miner's means of redress before the Commission—"action"—from that which it used to describe the means by which the Secretary pursues relief on behalf of the miner—"complaint."

Finally, the Secretary maintains that Vulcan's interpretation conflates the temporary reinstatement with a merits decision, disregards the Commission's important fact-finding role, and ignores Congress's "recognition that even if the Secretary decides not to proceed under Section 105(c)(2), there is still a realistic possibility that discrimination occurred." Appellee's Br. 28. Again, we do not perceive the same infirmities in Vulcan's plain meaning analysis.

The approach we have outlined does not conflate the "not frivolously brought" and "not been violated" standards. 30 U.S.C. § 815(c)(2) & (3). These questions are posed at different stages in the investigative process. Congress established a lower threshold for temporary reinstatement because the Secretary must seek that relief early in the process, *before* she has had an opportunity to complete her investigation. At this stage, Congress essentially gives the miner the benefit of the doubt with respect to the merits of his claim. However, once the Secretary completes her investigation, her actual findings take precedence.

We also disagree that, if a temporary reinstatement order is dissolved at the time of the Secretary's "no-merit"

finding, the Commission is deprived of its fact-finding role. The duration of temporary reinstatement is a separate and distinct issue from the merits of the miner's underlying claim. Congress did not give the Commission *any* discretion with respect to whether temporary reinstatement is ordered, *see* 30 U.S.C. § 815(c)(2) ("[I]f *the Secretary finds* that such complaint was not frivolously brought, *the Commission*[] . . . *shall order* the immediate reinstatement of the miner . . . .") (emphasis added), and it follows, therefore, that it does not disturb the Commission's role in the statutory scheme that the termination of those benefits should rest on the Secretary's determination.

Finally, the mere existence of a miner's "independent avenue of adjudication" under § 815(c)(3) hardly suggests a congressional intent to provide temporary reinstatement during those proceedings. *See* Appellee's Br. 28 (internal quotation marks omitted). Indeed, given the statutory structure that we have described previously, we believe that the fact that this avenue of adjudication is independent of the Secretary's involvement, both statutorily and in practice, strongly suggests that temporary reinstatement does not extend to this process.[3]

---

[3] As noted previously, the Secretary also maintains that Vulcan's view is untenable because her decision on the merits is a "determination," not a "final order on the complaint" by the Commission. Thus, her merits decision cannot be the event that triggers the end of temporary reinstatement.

(continued...)

### D. Deference to the Secretary

Because we have determined that the plain meaning of § 815(c) requires that we reverse the Commission, we do not need to reach the question of the proper deference owed to the Secretary's interpretation of the statute. *See Chevron USA v. Natural Res. Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed

---

[3] (...continued)

It is true that the statute does not set forth explicitly how a temporary reinstatement order is dissolved if the Secretary concludes that there is no merit to the complaint. This silence, however, affects both Vulcan's and the Secretary's proposed reading of the statute. According to the Secretary's interpretation, temporary reinstatement continues through the Secretary's prosecution of the miner's complaint or through the miner's action on his own behalf. However, if the Secretary should decline to file a complaint on behalf of the miner, and the miner also decides not to pursue his own action before the Commission, there is no final order on the miner's complaint to signal the end of temporary reinstatement. *See Gray*, 33 FMSHRC at 57 (Duffy and Young, Comm'rs, dissenting) ("Moreover, the center of our colleagues' case—that because there is no 'order' terminating the complaint to MSHA, reinstatement must continue—is undercut by a fact acknowledged by the majority: there is no order disposing of a temporary reinstatement if the miner elects *not* to proceed with a private action within 30 days.").

intent of Congress."). Nevertheless, even if the statute were ambiguous, we nevertheless would conclude that the Secretary's interpretation is not entitled to deference under *Chevron*. We also would conclude that, under the factors set forth in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), the Secretary's position lacks the "power to persuade."

## 1.

The Secretary's claim to *Chevron*-type deference rests in large part on *Secretary of Labor v. Excel Mining, LLC*, 334 F.3d 1 (D.C. Cir. 2003).[4] In *Excel*

---

[4] In her brief before this court, the Secretary also relied upon statements in *Pendley v. Federal Mine Safety & Health Review Commission*, 601 F.3d 417, 423 & n.2 (6th Cir. 2010). In *Pendley*, the Sixth Circuit observed that a court "must . . . give *Chevron* deference to the Commission's reasonable interpretation of ambiguous provisions of the Mine Act" and that "the Secretary of Labor's reasonable interpretation will supersede that of the Commission." We agree with these statements as general propositions. *Pendley* does not address, however, the different types of agency pronouncements and the varying degrees of deference owed to those pronouncements. *See United States v. Mead Corp.*, 533 U.S. 218, 228 (2001).

Moreover, since this case was briefed, the Sixth Circuit has addressed the *precise issue* currently before this court and held that the Secretary's position was not entitled to *Chevron* deference. *N. Fork Coal Corp. v. Fed. Mine Safety & Health Rev. Comm'n*, 691 F.3d 735 (6th Cir. 2012). It stated:

(continued...)

*Mining*, the court reviewed the *Chevron* analysis and observed that,

> in the statutory scheme of the Mine Act, "'the Secretary's litigating position before [the Commission] is as much an exercise of delegated law-making powers as is the Secretary's promulgation of a . . . health and safety standard,'" and is therefore deserving of deference. *RAG Cumberland* [*Res., LP v. Fed. Mine Safety & Health Review Comm'n*], 272 F.3d [590,] 596 n. 9 [(D.C. Cir. 2001)] (quoting *Martin*[ *v. Occupational Safety & Health Review Comm'n*], 499 U.S. [144,] 157 [(1991)]).

---

⁴ (...continued)

> While deference is due, our precedent precludes the application of full *Chevron* deference in this case. In *Chao v. Occupational Safety & Health Review Commission*, 540 F.3d 519 (6th Cir. 2008), we stated that *Chevron* deference "is not required where the interpretation is offered via an informal medium—such as an opinion letter, agency manual, policy statement, or enforcement guideline—that lacks the force of law." *Id.* at 527 (citing *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000)). Because the Secretary's interpretation in *Chao* was a litigation position, we held that it was entitled to *Skidmore* deference, only. *Id.* at 526–27 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

> Similarly, in the present case, because the Secretary's interpretation has been offered in litigation, it is afforded no more than *Skidmore* deference.

*Id.* at 742-43.

*Id.* at 6 (parallel citations omitted). Because the Supreme Court's decision in *Martin v. Occupational Safety & Health Review Commission*, 499 U.S. 144 (1991), is the ultimate source for this proposition, the circumstances and holding in *Martin* must guide our application.

In *Martin*, the court "consider[ed] the question to whom should a reviewing court defer when the Secretary of Labor and the Occupational Safety and Health Review Commission furnish reasonable but conflicting interpretations of an ambiguous regulation promulgated by the Secretary under the Occupational Safety and Health Act of 1970." 499 U.S. at 146. At issue in *Martin* was

> the Secretary's effort to enforce compliance with OSH Act standards relating to coke-oven emissions. Promulgated pursuant to the Secretary's rulemaking powers, these standards establish maximum permissible emissions levels and require the use of employee respirators in certain circumstances. See 29 CFR § 1910.1029 (1990). An investigation by one of the Secretary's compliance officers revealed that respondent CF & I Steel Corporation (CF & I) had equipped 28 of its employees with respirators that failed an "atmospheric test" designed to determine whether a respirator provides a sufficiently tight fit to protect its wearer from carcinogenic emissions. As a result of being equipped with these loose-fitting respirators, some employees were exposed to coke-oven emissions exceeding the

> regulatory limit. Based on these findings, the
> compliance officer issued a citation to CF & I and
> assessed it a $10,000 penalty for violating 29 CFR
> § 1910.1029(g)(3) (1990), which requires an em-
> ployer to "institute a respiratory protection pro-
> gram in accordance with § 1910.134." CF & I con-
> tested the citation.

*Id.* at 148. The Secretary prevailed before the ALJ, but
the full Commission subsequently vacated the citation
on the ground that the Secretary had misinterpreted
the regulation under which the citations were issued. *See
id.* at 149. The Tenth Circuit deferred to the Commission's,
not the Secretary's, interpretation of the regulation, but
the Supreme Court reversed. Looking to the structure
and history of OSHA, the Court concluded that "the
power to render authoritative interpretations of OSH Act
regulations is a 'necessary adjunct' of the Secretary's
powers to promulgate and to enforce national health
and safety standards." *Id.* at 152. Thus, whether courts
owe *Chevron*-type deference to the Secretary's position
outside of the context of her interpretation of her own
ambiguous regulation simply was not before the Court.

Nevertheless, the Court discussed the question of the
degree of deference owed to the Secretary's interpreta-
tion in response to certain arguments made by the em-
ployer in favor of deferring to the Commission's inter-
pretation. The Court stated:

> We are likewise unpersuaded by the contention
> that the Secretary's interpretations of regulations
> will necessarily appear in forms undeserving

of judicial deference. Our decisions indicate that agency "litigating positions" are not entitled to deference when they are merely appellate counsel's "*post hoc* rationalizations" for agency action, advanced for the first time in the reviewing court. See *Bowen v. Georgetown Univ. Hospital*, [488 U.S. 204, 212 (1988)]; *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Because statutory and regulatory interpretations furnished in this setting occur *after* agency proceedings have terminated, they do not constitute an exercise of the agency's delegated lawmaking powers. The Secretary's interpretation of OSH Act regulations in an administrative adjudication, however, *is* agency action, not a *post hoc* rationalization of it. *Moreover, when embodied in a citation, the Secretary's interpretation assumes a form expressly provided for by Congress.* See 29 U.S.C. § 658. Under these circumstances, the Secretary's litigating position before the Commission is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a workplace health and safety standard.

*Id.* at 156-57 (fifth emphasis added).

There are several reasons why this discussion in *Martin* cannot support the general proposition that the Secretary's litigation position concerning the meaning of the Federal Mine Safety and Health Act must be accorded *Chevron* deference here. First, the Court itself "emphasize[d] the narrowness of [its] holding." *Martin*, 499 U.S. at 157. It stated:

We deal in this case only with the division of powers between the Secretary and the Commission under the OSH Act. We conclude from the available indicia of legislative intent that Congress did not intend to sever the power authoritatively to interpret OSH Act regulations from the Secretary's power to promulgate and enforce them. . . .

In addition, although we hold that a reviewing court may not prefer the reasonable interpretations of the Commission to the reasonable interpretations of the Secretary, we emphasize that the reviewing court should defer to the Secretary only if the Secretary's interpretation *is* reasonable. The Secretary's interpretation *of an ambiguous regulation* is subject to the same standard of substantive review as any other exercise of delegated lawmaking power. As we have indicated, the Secretary's interpretation is not undeserving of deference merely because the Secretary advances it for the first time in an administrative adjudication. But as the Secretary's counsel conceded in oral argument, the decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties, on the quality of the Secretary's elaboration of pertinent policy considerations, and on other factors relevant to the reasonableness of the Secretary's exercise of delegated lawmaking powers.

*Id.* at 157-58 (last emphasis added) (citations omitted).

Additionally, the Court's discussion of deference speaks to an administrative adjudication—the Secretary's effort to enforce, administratively and judicially, a *safety* citation—different in kind from what is at issue here. The Court observed:

> The Secretary's interpretation of OSH Act regulations in an administrative adjudication, however, *is* agency action, not a *post hoc* rationalization of it. Moreover, *when embodied in a citation*, the Secretary's interpretation assumes a form expressly provided for by Congress. See 29 U.S.C. § 658. *Under these circumstances* the Secretary's litigating position before the Commission is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a workplace health and safety standard.

*Martin*, 499 U.S. at 157 (third and fourth emphases added).

The situation at bar, however, does not involve the Secretary's determination or enforcement of a *safety citation* issued pursuant to 30 U.S.C. § 814, the Federal Mine Safety and Health Act's equivalent to OSHA's 29 U.S.C. § 658. The Secretary is not seeking to enforce through litigation a citation that she issued pursuant to § 814. Moreover, there is no specific grant of authority allowing the Secretary to determine, in the first instance, when a temporary reinstatement order should end. Indeed, according to § 815(c)(3), the Secretary's role in a miner's retaliation claim ends when she determines that the complaint has no merit; the Secretary has no

involvement in an action brought by a miner on his own behalf. Consequently, there is no agency enforcement action of the kind at issue in *Martin* to which the court must defer. The later cases, on which the Secretary relies, untether *Martin* from these legal and factual moorings and, as a result, are unpersuasive.

Granting *Chevron*-type deference to an agency's general policy or interpretive statements, regardless of how and in what form they are communicated, runs afoul of the Supreme Court's guidance in *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). In *Christensen*, the Court held that less-formal agency interpretations, "not one[s] arrived at after, for example, a formal adjudication or notice-and-comment rulemaking," "do not warrant *Chevron*-style deference." *Id.* More recently, in *Gonzales v. Oregon*, 546 U.S. 243 (2006), the Court reiterated that the lynchpins of *Chevron* deference are whether there is a Congressional delegation of authority and whether the promulgation is made pursuant to that delegation:

> Executive actors often must interpret the enactments Congress has charged them with enforcing and implementing. . . . Although balancing the necessary respect for an agency's knowledge, expertise, and constitutional office with the courts' role as interpreter of laws can be a delicate matter, familiar principles guide us. An administrative rule may receive substantial deference if it interprets the issuing agency's own ambiguous regulation. *Auer v. Robbins*, 519 U.S.

452, 461-463 (1997). *An interpretation of an am-*
*biguous statute may also receive substantial defer-*
*ence. Chevron U.S.A. Inc. v. Natural Resources De-*
*fense Council, Inc., 467 U.S. 837, 842-845 (1984).*
*Deference in accordance with Chevron, however, is*
*warranted only "when it appears that Congress dele-*
*gated authority to the agency generally to make*
*rules carrying the force of law, and that the agency*
*interpretation claiming deference was promulgated*
*in the exercise of that authority." United States v.*
*Mead Corp., 533 U.S. 218, 226–227 (2001). Otherwise,*
*the interpretation is "entitled to respect" only to the*
*extent it has the "power to persuade." Skidmore v.*
*Swift & Co., 323 U.S. 134, 140 (1944).*

*Gonzales*, 546 U.S. at 255-56 (emphasis added). Our own
case law has reiterated these important criteria for in-
voking *Chevron* deference.[5]

---

[5] *See, e.g., Joseph v. Holder*, 579 F.3d 827, 831 (7th Cir. 2009)
("*Chevron*, however, deals only with the question whether an
agency acts within its authority when it formulates a policy and
issues a regulation."); *Sehie v. City of Aurora*, 432 F.3d 749, 753
(7th Cir. 2005) (stating that "we are not bound by informal
administrative opinions" and citing *Christensen*); *White v.
Scibana*, 390 F.3d 997, 1000 (7th Cir. 2004) ("Not all agency
interpretations of ambiguous statutes are entitled to full
*Chevron* deference; some are treated as persuasive only, based
upon the form, content, circumstances, and reflected
expertise of the interpretation." (citing *Mead*)); *Indiana Family
& Soc. Servs. Admin. v. Thompson*, 286 F.3d 476, 480 (7th Cir.
(continued...)

The Secretary's pronouncement was not issued pursuant to rulemaking authority. Nor is her position "embodied in a citation"—a form of administrative interpretation "expressly provided for by Congress." *Martin*, 499 U.S. at 157. Instead, the Secretary has articulated her position in litigation before the Commission and before the Courts of Appeals. Thus, even if § 815(c) were ambiguous with respect to the duration of the temporary reinstatement provision, we would not accord the Secretary's position *Chevron* deference, but rather we would give it "'respect'" based on "its 'power to persuade.'" *Christensen*, 529 U.S. at 587 (quoting *Skidmore*, 323 U.S. at 140).

**2.**

Under *Skidmore*, a court will respect an agency's interpretation of the statute it administers, but only to the extent that the agency's interpretation possesses the "power to persuade." *Skidmore*, 323 U.S. at 140; *see also, e.g.*, *Arobelidze v. Holder*, 653 F.3d 513, 520 (7th Cir. 2011). In assessing the persuasive power of an agency's interpretation, "we examine 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and

---

[5]  (...continued)
2002) ("*Mead*[] . . . makes clear that not all agency interpretations of its own laws are entitled to full *Chevron* deference. Only those subject to notice-and-comment or comparable formalities qualify.").

all those factors which give it power to persuade, if lacking power to control.'" *Arobelidze*, 653 F.3d at 520 (quoting *Skidmore*, 323 U.S. at 140). We believe that these factors militate strongly against adopting the Secretary's position.

For nearly thirty years, the Secretary deferred not only to the Commission's interpretation of the temporary reinstatement provision, but also to the Commission's *authority* to interpret that provision. At no time during those three decades did the Secretary suggest that the Commission's interpretation of the provision was wrong or that the Commission had overstepped its authority in issuing rules on temporary reinstatement. This silence substantially undermines the Secretary's current claim that she possesses "historical familiarity and expertise," Appellee's Br. 12 (internal quotation marks omitted), with respect to the administration of the temporary reinstatement provision such that we should defer to her position. *See N. Fork Coal*, 691 F.3d at 744.

Moreover, when the Secretary recently decided to speak on the issue, she did so in a series of briefs before the Commission and the Courts of Appeals. Her position was not subject to an outside vetting process such as public commentary. *See Christopher v. Smithkline Beecham Corp.*, 132 S. Ct. 2156, 2169 (2012) (observing that the Department of Labor's interpretation of a regulation articulated in a series of amicus briefs "plainly lack[ed] the hallmarks of thorough consideration" because "there was no opportunity for public com-

ment"). Moreover, she does not explain her recent assertions of authority or interpretation of the statute in a manner that suggests that the position now being advocated was given thoughtful consideration within the agency. *See Kentucky Ret. Sys. v. EEOC*, 554 U.S. 135, 150 (2008) (noting that policy statements that the agency "ma[de] little effort to justify lack[] the necessary 'power to persuade'" (quoting *Skidmore*, 323 U.S. at 140)).

Finally, as we already have explained,[6] we do not believe that the Secretary's position satisfactorily accounts for the explicit language and context of the temporary reinstatement provision or for the structure of § 815(c). The shortcomings in both the manner in which the Secretary announced her position and the substance of that position prevent us from finding her position persuasive. Consequently, even if we thought the statute ambiguous, we would not defer to the Secretary's view.

Because we adopt Vulcan's interpretation of the temporary reinstatement provision, we need not address its argument that the Secretary's proposed interpretation raises constitutional concerns. Specifically, we do not reach the question whether the guarantee of temporary reinstatement beyond the Secretary's no-merit determination, without any provision for the mine owners' recoupment of the sums paid over the course of several months or years, deprives mine owners of their right to due process of law. *See Brock v. Roadway*

---

[6] *See supra* at pp. 25-32.

*Express, Inc.*, 481 U.S. 252, 260-61 (1987) (holding that the "right to discharge an employee for cause constitutes a property interest protected by the Fifth Amendment," the deprivation of which must be accompanied by an "opportunity to be heard 'at a meaningful time and in a meaningful manner'" (quoting *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976))).

## Conclusion

For the reasons set forth in this opinion, we do not believe the Commission's denial of Vulcan's motion to dissolve the temporary reinstatement order can be squared with the plain language of 30 U.S.C. § 815(c). We therefore grant Vulcan's petition for review and reverse the judgment of the Commission.

PETITION GRANTED;
JUDGMENT REVERSED
