**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1103n.06

**No. 11-6440**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Oct 25, 2012*

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| D. ARCHIE HALE, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| ABF FREIGHT SYSTEM, INC., | ) | O P I N I O N |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: BOGGS and McKEAGUE, Circuit Judges, and WATSON, District Judge.[*]

**McKEAGUE, Circuit Judge.** Plaintiff D. Archie Hale ("Hale") appeals the district court's grant of summary judgment for his employer, ABF Freight System ("ABF"). Hale contends that he was terminated and subject to a hostile work environment because of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., and Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq*. Because Hale has failed to present evidence of discriminatory conduct rising to the level of frequency and severity necessary to establish a hostile work environment, we AFFIRM the district court's judgment on this claim. However, we find that Hale has presented sufficient evidence to establish a genuine issue of material fact as to

---

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

whether he was terminated because of age and accordingly REVERSE the judgment of the district court and REMAND for trial on this claim.

## I. BACKGROUND

Hale was first employed by ABF from 1982 through 1984 as an operations supervisor at ABF's Chattanooga terminal. In 1997, Hale was again hired by ABF for the same position and remained with ABF until his termination twelve years later on October 5, 2009. He was recruited and hired by Pam Laney, the ABF branch manager at the Chattanooga terminal and Hale's supervisor throughout the twelve-year period of his employment. Hale was 50 years old when he was hired by ABF for the second time in 1997.

As an ABF employee, Hale received a copy of ABF's Code of Conduct, which states ABF's status as an equal opportunity employer, obligates employees to report illegal or unethical behavior, and sets out a procedure for doing so. Hale signed an acknowledgement but admitted in his deposition that he did not actually read the Code. Hale never utilized any internal procedures to report illegal harassment or discrimination.

As an operations supervisor, Hale was responsible for setting up delivery routes, calling customers to schedule deliveries, dispatching drivers for freight pickups, supervising loading and unloading, ordering parts and supplies for maintenance, and managing overage, shortage, and damaged freight. Hale worked from 5:30 a.m. to about 3:30 p.m. A second operations manager, Mark Stewart, came in at around 1 p.m. to handle afternoon shipments.

According to Hale, in the twelve-year-period of his employment with ABF during which he dealt with 500-600 customers a week, he received only two customer complaints. He received 19

raises, several commendation letters from customers, and one commendation letter from ABF's Vice

President of Operations and Sales. Hale alleges that none of the letters were put in his employee file.

On his annual employee reviews, all signed by Laney, Hale consistently received satisfactory

marks.[1]  For example, in 1997, out of 60 applicable categories, Hale was rated as "satisfactory" in

50 and "needs improvement" in 10.  From 2000-2009, Hale did not receive any "unacceptable"

marks and consistently received more "meets or exceeds expectations" than "needs improvement"

marks.[2]  The comments on Hale's employee reviews from 2003-2005 and 2009 suggest he could

have more of a "can do" attitude and improve on telephone courtesy.  Other comments throughout

the years state that Hale was doing a great job.

Beginning in February 2009, Hale began to have a series of problems at work, evidenced by

emails between Hale and Laney as well as copies of Employee Discussion Reports ("EDRs")

documenting Hale's mistakes.  These issues coincided with Laney inquiring about Hale's retirement

plans and making age-related comments.

---

[1]In 1997 and 1998, the employee review forms provided for three rankings: "needs improvement," "satisfactory," and "not applicable."  No review form from 1999 was provided in the record.  The review forms from 2000-2009 provided four rankings: "meets or exceeds expectations," "needs improvement," "unacceptable performance," and "not applicable."

[2]Excluding 2009, Hale received anywhere from 3 to 17 "needs improvement" marks, receiving "meets or exceeds expectations" in the remaining categories, out of a total of 60-63 applicable categories.  In 2009, his worst year, Hale was rated "needs improvement" in 26 categories and "meets or exceeds expectations" in 34, out of a total of 60 applicable categories.

*February 23, 2009*: Laney emailed Hale, reprimanding him for a delayed "Timekeeper"[3] shipment, seven other late deliveries, and 52 early deliveries during the previous week. Laney also directed Hale not to mark a shipment "on hand"[4] until Hale called the customer, and, if the customer could not be reached, mailed an auto-generated letter to the customer explaining why the shipment was put on hand. She ended with several other complaints about Hale's performance, stating, inter alia, that she wanted Hale to keep up with emails, timely submit supplies inventories, and tidy up his work space. Laney also filled out an EDR regarding the untimely shipments.

Hale responded the same day, giving his rationale for each delayed delivery. He admitted that "some things could have been done different" but that he was "looking to get the maximum freight delivered and going to Athens [location of Timekeeper delivery] that day would have been two hours of driving with nothing to pick up there after I finished delivery." In his deposition, Hale explained that it had been his common practice to group together shipments going to the same place and deliver them at the same time, saying, "If you've got two shipments, you don't deliver one just because and hold the other one because it's got a different delivery date." He also stated that this had never been a problem before. Regarding the late Timekeeper shipment, Hale testified that he called the customer to explain the shipment would be delayed, the customer told Hale to deliver the following day, and the customer paid the entire shipping fee anyway.

---

[3]A "Timekeeper" shipment had a specific delivery date and sometimes a specific delivery time. The "Timekeeper" program was part of a marketing campaign in which ABF guaranteed delivery on the specified date and time or the shipment would be free.

[4]"On hand" appears to refer to a problematic shipment being stored at the shipping terminal while ABF attempted to reach the recipient and coordinate with the shipper to resolve the issue.

Hale also responded in writing to the EDR, explaining his rationale behind the early deliveries. He stated that he had been keeping up with monthly supplies inventories and was not aware of any instances of untimeliness. He did not mention that the Timekeeper customer had paid the shipping fee.

*March 2009*: Hale testified that sometime in March 2009, Laney inquired when he was planning to retire. He responded that he was planning to retire five years later at age 67 because he would then be able to draw the maximum amount of social security and be on Medicare.

*March 13, 2009*: Laney emailed Hale and Stewart telling them that they must call a customer prior to a pickup to make sure the freight was ready and "not waste valuable time and money" sending a driver to check if a shipment is ready "when it would take . . . 2 minutes to pick up the phone."

*March 15, 2009*: Laney emailed Hale about failing to call prior to a pickup, saying "[w]e have been over this so many times, why have you continued to not call yourself like I instructed you to do?" Hale responded on March 17, admitting that while he had generally been calling prior to pickup, he had "missed this one [Industrial Valve pickup]." This began an extended email exchange lasting through March 24, wherein Laney repeatedly asserted that Hale failed to call prior to pickup on more occasions than just the Industrial Valve pickup and demanded explanations why he continued to do so and Hale repeatedly responded that he was aware of Laney's desired procedure though he may have made some mistakes and that he had nothing further to say. In a sworn declaration submitted after his deposition, Hale claimed that it had been his usual practice to ask a driver to take five to ten minutes to check in on a customer if he could not reach the customer by

phone. He stated it made customers happy, made sense logistically, and had not been a problem before March 2009.

Laney emailed Hale to express frustration with a delivery made prior to the delivery window and Hale's failure to personally call the customer regarding the change. Laney stated such conduct was inappropriate when Hale had set the delivery window in the first place and that she could not believe Hale would treat a customer like this. Hale replied that he does not call anyone before 8 a.m., especially with residential deliveries, and that the driver had called the customer before Hale could.

Laney emailed Hale stating, "I am continuing to be amazed that you are ignoring instructions that I have given you on how you are supposed to be doing things." She then faulted Hale for failing to update the equipment pool report—e.g., changing the status of trailers from "inbound" to "city" and making sure a customer's last name appeared on a "U-Pack." In his email response, Hale admitted that he missed one "U-Pack"; in his deposition, Hale claimed that he missed one out of 50 total trailers and, further, that Stewart had missed it as well because the equipment pool report that contained the mistake was printed at 4:05 p.m., after Stewart would have checked all the trailers at the start of his shift.

*March 16, 2009*: Laney emailed Hale referring to an email she sent Hale and Stewart on February 5, 2009 about limiting their internet usage to work-related matters. Hale admitted he had been guilty of visiting non-work related websites to read local news and sports. The next day, Laney sent a long reply to Hale, demanding an explanation why Hale was back on the internet after her February 5 email. She reiterated some of Hale's work performance issues mentioned in her earlier

emails, such as failing to call a customer before sending a driver to pick up freight and improperly coding shipments "on hand," as examples of things Hale should be working on instead of being on the internet. Hale replied that he had already responded to her concern about his internet usage, that he had no excuse, and that he hoped to have an opportunity to correct his behavior.

Laney emailed Hale, chastising him for improperly coding shipments as "short" and for putting deliveries on drivers' manifests without actually loading the shipments on the trailers and marking the fake deliveries as "closed" (meaning the customer was not there at the time of delivery) in order to prevent shipments from appearing as failed deliveries. Hale replied, explaining why he had marked certain deliveries as "closed." In his deposition, Hale claimed that this practice of coding shipments inaccurately to avoid delivery failures had been accepted up to this point.

*March 18, 2009*: Laney emailed Hale, criticizing him for failing to keep properly stocked and tidy an area in the back of the terminal rented to vendors who serviced ABF's trucks. Hale promised a monthly inventory and to make sure the vendors kept the area clean.

Laney emailed Hale, reprimanding him for failing to follow the proper procedure before marking shipments "on hand" despite her having instructed him "at least 50 times" on the protocol. Laney listed a number of shipments Hale had marked "on hand" for reasons ranging from bad weather to disconnected phone numbers. Hale responded, explaining how each shipment Laney mentioned was handled and admitting that one shipment was "absolutely handled . . . wrong." In her reply, Laney reiterated her initial email and demanded an explanation why Hale continued to flout her instructions. Hale replied that he believed he had handled the shipments appropriately but would follow Laney's instructions in the future.

*May 4, 2009*: Laney filed an EDR regarding Hale's failure to submit a preventative maintenance log to the maintenance manager by April 30, which Laney submitted in place of Hale. In his deposition, Hale admitted he failed to submit the log on time but claimed it was the first time he had made this mistake in twelve years. In his subsequent sworn statement, Hale claimed that the maintenance manager called to remind him to send the log, and Laney happened to take the phone call and then used the incident to discipline him again.

*May 22, 2009*: Laney emailed Hale, scolding him for failing to inform her of a driver's vacation day and asking why he lied to her and blamed Stewart. Hale responded that it would not happen again, that he did not lie, and that while he knew the driver would be off, he had not been personally informed. In his deposition, Hale explained that the whole matter had been a miscommunication: Stewart had actually initialed off on the driver's vacation day and Laney mistakenly thought the initials were Hale's. Hale testified that Stewart subsequently advised Laney the initials were his.

*June 2009*: During the first week of June, Hale took a vacation. He received a call from Laney in the middle of this week, informing him that she needed to lay off one supervisor. Hale responded that he had been at ABF longer than the other two operations supervisors. Hale claims that Laney then asked whether he had thought any more about retiring because he had a birthday coming up. Hale answered no and reminded Laney that he had already told her when he planned to retire. Laney stated she had to lay him off, and Hale said they could discuss it when he returned to work the next week. Laney spoke to Stewart about the layoff as well, and Stewart offered to take

it because he wanted to go back to school to become a teacher. When Hale returned to work, Laney did not bring up the layoff again, and no supervisor was laid off during this time.

*June 11, 2009*: Hale's 2009 employee review was issued on June 11. He received "needs improvement" in 26 categories and "meets or exceeds expectations" in 34, out of a total of 60 applicable categories. The comments, presumably written by Laney as the comment sheet bears only her and Hale's signatures, state that Hale "has done a lot better in the last 6-8 weeks on getting all of his work done and making better decisions" and was "communicating on a daily basis." The comments encourage Hale to continue the good work, to adopt more of a "can do" attitude with customers on the phone, and to go the extra mile.

*June 15, 2009*: Laney submitted an EDR stating that Hale had been discussing work-related issues between himself and Laney with the drivers. She requested that Hale refrain from discussing such matters with other employees. Hale testified that he had asked the drivers to help him make sure everything ran smoothly because he felt he was being scrutinized by Laney.

*June 16, 2009*: Laney sent an email to Hale and Stewart indicating that they needed to cut as many hours and as much overtime as possible and laying out new time-saving procedures.

*October 2009:* No further altercations or communications between Laney and Hale appear in the record until the event that led to Hale's termination. On October 2, 2009, Hale dispatched a driver to two pickup locations without confirming the pickups with the customers first, as previously instructed by Laney. On October 5, after confirming what had happened with the driver, Laney terminated Hale. Hale testified that he had, in fact, called the two customers but failed to get confirmations because neither answered. Hale had a driver within fifteen minutes of the pickup

locations and decided to send the driver by without getting approval from Laney. The driver's total time on the road was ten hours. ABF has drivers on both eight-hour shifts and ten-hour shifts; Hale was unsure what kind of shift the driver was on and whether the detour resulted in overtime. After his termination, Hale contacted ABF's Human Resources department and suggested they look into certain aspects of Laney's conduct. He did not mention that he believed he was terminated due to age discrimination.

In his sworn statement, Hale stated that at most, the driver would have spent an extra 50 minutes to check on the two locations but that "based on the proximity of each location, it most likely took less time." He also stated that he had been making judgment calls like this for twelve years and felt it was the right call. However, Hale admitted in his EEOC filing that it had been a mistake not to confirm prior to pickup.

James Watts, a former ABF driver who is now retired, submitted a sworn declaration stating that Laney focused a constant stream of criticism on Hale for trivial things and that it was "obvious" she was trying to force him to quit. He corroborates many parts of Hale's testimony, including that many of the things for which Hale was reprimanded had been accepted practice both before and after Hale's termination. Watts also attests that he heard Laney say, referring to Hale, "He is going to leave here when he is 62. I am going to see to it. He has been here long enough, and he is going to go on his social security." Watts does not indicate when or where he heard this statement.

Following his termination, Hale filed a charge with the EEOC (and eventually received a right-to-sue letter) and filed suit against ABF in Chancery Court in Hamilton County, Tennessee, alleging discriminatory discharge and hostile work environment under the THRA. ABF removed

the case to federal district court based on diversity of citizenship. Hale then amended his complaint to add federal claims under the ADEA. ABF moved for summary judgment on all claims, which the district court granted.

## II. ANALYSIS

### A. Standard of Review

This court reviews a district court's grant of summary judgment de novo. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Summary judgment is appropriate when the materials in the record "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment will not lie if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering this question, the court reviews the record in the light most favorable to the non-moving party, drawing "all justifiable inferences" in its favor. *Id.* at 255.

### B. Wrongful Termination

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The THRA similarly makes it unlawful for an employer to "[f]ail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex,

age or national origin[.]" Tenn. Code Ann. § 4-21-401. The protection against age discrimination is limited to people who are at least 40 years old. 29 U.S.C. § 631(a); Tenn. Code Ann. § 4-21-407(b). In order to prevail, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 177-78 (2009).[5]

"Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (internal quotation marks omitted). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.* Under both direct and circumstantial evidence, the burden of persuasion remains on the ADEA plaintiff. *Geiger*, 579 F.3d at 620 (citing *Gross*, 557 U.S. at 178 n.4). Hale contends that the district court erred in determining that he was unable to meet his burden under both evidentiary standards.

### i. Direct Evidence

Hale offers the following as direct evidence of age discrimination:

---

[5]Hale contends that his discrimination claim under the THRA should be analyzed under a "motivating factor" framework rather than the "but-for" standard announced in *Gross*. Tennessee courts have yet to pass upon the impact (or lack thereof) of *Gross* upon Tennessee law. *See Parker v. Warren Cnty. Util. Dist.*, 2 S.W.3d 170, 172-73 (Tenn. 1999) (noting that while the Tennessee legislature intended the THRA to be "coextensive with federal law," Tennessee courts are "neither bound by nor limited by the federal law when interpreting [the] state's anti-discrimination statute"). We need not decide this question because we find that Hale has met the more onerous "but-for" standard for purposes of summary judgment. Hale's THRA claim thus proceeds along with his ADEA claim.

- Laney's inquiry in March 2009 as to when Hale was planning to retire.

- Laney's inquiry in June 2009 as to whether Hale had thought more about retirement, in light of his upcoming birthday.

- The fact that these inquiries coincided with a sudden escalation in Laney's criticisms of his job performance.

- Laney's statement, "He is going to leave here when he is 62. I am going to see to it. He has been here long enough, and he is going to go on his social security."

"Direct evidence . . . proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). "In assessing the relevancy of a discriminatory remark, we look first at the identity of the speaker. An isolated discriminatory remark made by one with no managerial authority over the challenged personnel decisions is not considered indicative of age discrimination." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998). Further, "[o]ur consideration of a speaker's role in the employment decision adversely affecting the plaintiff does not end our inquiry. We must also examine the substance of the discriminatory remarks in determining their relevancy to a plaintiff's claim that an impermissible factor motivated the adverse employment action taken against him or her." *Id*. at 355.[6]

---

[6]In its amicus brief, the AARP argues that statements can constitute direct evidence of discrimination even if not made in connection with the plaintiff's termination. It cites two race discrimination cases from this Circuit that support this proposition: *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1249 (6th Cir. 1995), and *DiCarlo v. Potter*, 358 F.3d 408, 415-17 (6th Cir. 2004). We have previously noted the tension in the case law between these two cases, which found racist comments made by decisionmakers to constitute direct evidence of racially motivated terminations "notwithstanding that the comments were temporally removed from the termination decision and did not address the plaintiff in particular," and other Sixth Circuit cases "requiring some degree of connection between the comments and the relevant decision." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 525-26 (6th Cir. 2007), *overruled on other grounds by Gross*, 557

Laney's inquiries into Hale's retirement plans are not direct evidence of age discrimination because they do not require the conclusion that Hale was terminated because of his age. While such inquiries could make up circumstantial evidence that, in connection with other evidence, allow an inference that Laney terminated Hale because of his age, these inquires do not "prove[] the existence of a fact without requiring any inferences," *Rowan*, 360 F.3d at 548, and thus cannot be direct evidence.

Similarly, the timing of Laney's inquiries with her increased scrutiny of Hale's work performance does not amount to direct evidence. While increased demands or criticisms of a person's work performance in close temporal proximity to an adverse employment action can be probative of unlawful animus, *see, e.g., Ross v. Campbell Soup Co.*, 237 F.3d 701, 708 (6th Cir. 2001) (finding that chain of events leading to termination, including sudden drop in performance evaluation and dramatic increase in sales quotas, created inference of pretext), such evidence requires an inference in order to conclude that the animus caused the termination.

We believe, however, the following statement by Laney constitutes direct evidence that Hale was terminated because of his age: "He is going to leave here when he is 62. I am going to see to it. He has been here long enough, and he is going to go on his social security." Laney was Hale's immediate supervisor, had decisionmaking authority over his employment, clearly connected his age to her plans to terminate him, and did in fact terminate him.

---

U.S. at 180, *as stated in Geiger*, 579 F.3d at 621; *see also Chattman v. Toho Tenax Am., Inc.*, --- F. 3d ---, No. 10-5306, 2012 WL 2866296, at *4 (6th Cir. July 13, 2012).

We need not address this argument, as Laney's statement that she would "see to it" Hale was gone by the time he was 62 clearly connects Hale's age to the termination decision.

The district court, in finding that this statement was not direct evidence, relied on our decision in *Scott v. Potter*, 182 F. App'x 521 (6th Cir. 2006). In *Scott*, the plaintiff advanced as direct evidence the following comment said to him by his supervisor: "Why don't you retire and make everybody happy?" 182 F. App'x at 526. We found that this did not constitute direct evidence because a standalone reference to retirement does not necessarily invoke age: "In short, 'retire' and 'age' are not synonyms." *Id*. In other words, the supervisor's remark, though it evinced a desire to get rid of the plaintiff, did not necessarily connect that desire to the plaintiff's age. *Id*.

In so concluding, we drew upon the Supreme Court's decision in *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611-13 (1993), in which the Supreme Court clarified that considering factors such as pension status or seniority in a termination decision does not violate the ADEA because such factors, though typically correlated with age, are analytically distinct. As long as such factors are not used as a proxy for age, terminating someone simply based on years of service does not involve the "inaccurate and stigmatizing stereotypes" based on age that the ADEA seeks to prohibit. *Hazen Paper*, 507 U.S. at 610.

We think that Laney's statement is qualitatively different from the statement in *Scott* because she unequivocally links Hale's age to her decision to terminate him. While the *Scott* Court reasoned that the statement "retire" and "age" are not synonyms, "62" is synonymous with "age." If Laney had simply inquired into Hale's retirement status or stated that Hale had been at ABF "long enough" without any attendant reference to his age, this case may well have fallen under the logic of *Hazen Paper*, which instructs that "it is incorrect to say that a decision based on years of service is necessarily 'age based.'" 507 U.S. at 611. But Laney's alleged statement shows that her decision

was based not on an age-correlated factor but on age itself. *See Johnson v. New York*, 49 F.3d 75, 79-80 (2d Cir. 1995) (finding employment policy violated ADEA because "the decision to require dual status, with consequent mandatory retirement at 60 . . . , is not merely *correlated* with age; unlike *Hazen Paper*, the employer's decision here in fact *implements* an age-based criterion.").

In short, Laney's remarks, if believed, require the conclusion that being 62 was the precipitating factor of Hale's termination. Any uncertainty on this point, though, is resolved by Hale having more than met his burden under the circumstantial evidence route.

### ii. Circumstantial Evidence

A plaintiff may make a showing of age discrimination under the ADEA and the THRA by circumstantial evidence. *Geiger*, 579 F.3d at 620; *Frye v. St. Thomas Health Servs.*, 227 S.W.3d 595, 609 (Tenn. Ct. App. 2007). This Circuit, as well as the majority of other circuits, has held that after *Gross*, the *McDonnell Douglas* framework continues to apply to ADEA claims based on circumstantial evidence. *Geiger*, 579 F.3d at 622; *see also Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1278-79 (10th Cir. 2010) (collecting cases); *Shelley v. Geren*, 666 F.3d 599, 607-08 (9th Cir. 2012).

Under the well known *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination. Then, the burden of production shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. The plaintiff must then show by a preponderance of the evidence that the proffered reason is a pretext for discrimination.

No. 11-6440
*Hale v. ABF Freight Sys.*

The burden of persuasion remains at all times with the plaintiff.[7]  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000).  The district court found that Hale established a prima facie case but failed on pretext.

### a. Prima Facie Case

To establish a prima facie case of age discrimination under the ADEA, a plaintiff must show that (1) he was a member of a protected class; (2) he was subject to an adverse employment action; (3) he was qualified for the position held; and (4) he was replaced by a younger worker.  *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007).  ABF contends that Hale has failed to establish the third and fourth prongs.

To argue that Hale was not qualified for his job, ABF points to the string of documented issues with Hale's job performance starting in February 2009.  We rejected this type of argument in *Wexler*:

---

[7]Neither party discusses the Tennessee Supreme Court's decision in *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 785 (Tenn. 2010), *superseded by statute as stated in Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 758 (6th Cir. 2012), which held that "the *McDonnell Douglas* framework is inapplicable at the summary judgment stage because it is incompatible with Tennessee summary judgment jurisprudence."  Under *Gossett*, "a party moving for summary judgment must produce evidence or refer to evidence in the record that affirmatively negates an essential element of the nonmoving party's claim or shows that the nonmoving party cannot prove an essential element of the claim at trial . . . .  Evidence satisfying an employer's burden of production pursuant to the *McDonnell Douglas* framework does not necessarily demonstrate that there is no genuine issue of material fact."  320 S.W.3d at 782 (citations and internal quotation marks omitted).

In a prior unpublished opinion, we have treated *Gossett* as a state procedural rule that does not apply in federal court in the absence of any argument otherwise.  *See Theus v. GlaxoSmithKline*, 452 F. App'x 596, 602 n.8 (6th Cir. 2011).  Regardless, as explained in more detail below, Hale has established a prima facie case and produced sufficient evidence of pretext to cast doubt on ABF's proffered nondiscriminatory reason and allow an inference of discrimination.  Thus, under *Gossett*'s more employee-favorable standard, ABF is clearly unable to show that Hale cannot prove an essential element of his age discrimination claim.

> [A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination.

317 F.3d at 574. Rather, the court must examine the plaintiff's evidence independent of the employer's proffered nondiscriminatory reason and determine whether the plaintiff has presented "credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Id*. at 576. "Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id*.

Hale clearly meets this prong of the prima facie case. The record indicates that Hale had nearly 40 years of operations experience in the freight industry. During the continuous twelve-year period he worked at ABF, his record was relatively clean. He received positive performance reviews all twelve years. It is clear that until the issues with Laney surfaced in 2009, Hale was considered a competent, qualified employee. *See, e.g., Geiger*, 579 F.3d at 624 (finding plaintiff was qualified for the job where he had already served in that position, had 27 years experience, and had received positive reviews).

ABF also contends that Hale fails to meet the fourth prong because he has not shown that he was replaced by someone outside of the protected class—i.e., under the age of 40. This argument fails because the Supreme Court has held that "the fact that an ADEA plaintiff was replaced by

someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). The Court explained:

> The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*. Or to put the point more concretely, there can be no greater inference of *age* discrimination (as opposed to "40 or over" discrimination) when a 40-year-old is replaced by a 39-year-old than when a 56-year-old is replaced by a 40-year-old.

*Id*. While some of this Circuit's cases, in reciting the elements of a prima facie case, have stated that an ADEA plaintiff must show that he was replaced by someone outside of the protected class, *e.g., Geiger*, 579 F.3d at 622, it is sufficient to show that a replacement is substantially younger. *O'Connor*, 517 U.S. at 313.

Here, Hale testified that to his knowledge, ABF did not hire a new operations manager to replace him. He testified that after he was terminated, ABF hired two women, whose positions he did not know, and a new salesman. He did not know the age of the salesman but testified that one of the ladies was in her 40s and the other in her 50s. Watts's declaration states that Hale's position was filled by a woman named Sue, who appeared to Watts to be younger than Hale. Viewing the record in the light most favorable to Hale, a reasonable jury could find that Hale was replaced by a woman substantially younger than he was, satisfying the fourth prong of the prima facie case.

### b. Pretext

In its brief, ABF states that it terminated Hale based on the multiple documented issues with his work performance beginning in February 2009 and specifically the incident on October 2, 2009, when Hale sent a driver to two pickup locations without receiving confirmation that the freight was ready. Hale does not dispute that these are facially legitimate reasons.

The burden thus shifts back to Hale to produce enough evidence to allow a reasonable jury to infer that ABF's proffered reasons are pretextual and that he was actually fired because of his age. A plaintiff may show pretext by demonstrating that the employer's proffered reason for termination "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Blair*, 505 F.3d at 532 (internal quotation marks omitted). "[R]ejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (emphasis omitted). Hale seeks to proceed under the second and third methods.

Looking to the third method first, such a showing ordinarily "consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct . . . ." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross*, 557 U.S. at 180, *as stated in Geiger*, 579 F.3d at 621. This type of rebuttal is a "direct attack[] on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide[s] an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.'" *Id.* (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 511). "[S]uch a showing permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's prima facie case." *St. Mary's Honor Ctr.*, 509 U.S. at 511.

Hale has put forth evidence that the conduct for which he was disciplined and eventually terminated was common and accepted practice before and after his termination. Watts's affidavit states that Laney herself engaged in these very practices, including sending drivers to check on pickups that had not been confirmed as ready. Watts states, "Ms. Laney sent me to pick up

shipments that had not been confirmed as ready for pickup on multiple occasions. This is common practice in the less than load trucking business, and Ms. Laney did this before and after Mr. Hale was terminated." Watts also states that Laney "also frequently delayed the delivery of shipments by marking them as 'short' in the computer because she wanted to wait until another piece of the shipment came into the terminal." And, "Ms. Laney instructed me on multiple occasions to put in the computer that a recipient was closed for the day so that ABF could delay shipping and avoid delivering that shipment on that day. For example, if two destinations were far apart, she would say, 'Just put in the computer that Sam's Whole Sale [sic] was closed.'" Lastly, Watts stated that he "personally observed Ms. Laney surfing the Internet during work hours on multiple occasions." Hale also states in his deposition that he had done his job the way he had always done it for 12 years, and his practices never became a problem until 2009, which coincided with the time Laney began inquiring into his retirement plans.

This evidence, if believed, shows that the terminating supervisor herself engaged in "substantially identical conduct," casting doubt on the credibility of her explanation for terminating Hale. A factfinder could find that Laney's given explanation was not sufficient to warrant termination and infer that Hale was in fact terminated because of his age. Thus, Hale has put forth sufficient evidence to show pretext under this method.

Under the second method,

> the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Manzer*, 29 F.3d at 1084. Hale has produced sufficient evidence for a reasonable jury to find that ABF's proffered reason is a pretext under this method as well.

First, the discriminatory remarks that Hale offered as direct evidence of age discrimination are also probative circumstantial evidence. *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 393 (6th Cir. 2009) ("We have held that discriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext."). Laney's statement that she would "see to it" that Hale left ABF by age 62 and go on his social security, if not direct evidence, certainly serves as strong circumstantial evidence that Laney terminated Hale because of his age. Second, Laney's inquiries into Hale's retirement plans (and subsequent discovery that he did not plan to retire until five years later) coincided closely with her escalating criticism of Hale. This court has found that "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009) (internal quotation marks omitted). Third, the aforementioned evidence that Laney accepted and engaged in the practices for which she reprimanded and eventually terminated Hale may show not only that such behavior was insufficient to warrant termination but also that it was not actually the reason for termination.

The record, taken all together and viewed in the light most favorable to Hale, would allow a reasonable jury to disbelieve the given reason for Hale's discharge and infer that Hale was terminated because of his age.[8] While such evidence does not require such a conclusion (one might

---

[8]Hale also argues the fact that Laney did not lay off Mark Stewart even though he had volunteered when she ostensibly needed to lay off one operations supervisor gives rise to an inference that she wanted to get rid of Hale because of his age. This factor is weak, given that Laney seems to have discussed the layoff with both Hale and Stewart and simply decided not to lay anyone off at that time. In any event, the evidence without this factor is sufficient to raise a genuine issue

believe that Laney was hostile to Hale for different reasons), all that is required to survive summary judgment is sufficient evidence to permit a reasonable trier of fact "to infer the ultimate fact of intentional discrimination." *St. Mary's Honor Ctr.*, 509 U.S. at 511.

The district court found that Hale failed to show pretext for four reasons. First, the court stated that "Hale has only a subjective belief age motivated ABF's decision to terminate him, and Hale never referred to age-related discrimination at any point before this lawsuit, including his phone call to ABF's human resources department after his discharge." Second, "Hale never heard ageist or age-related comments from Laney apart from her questions relating to his possible retirement." Third, "Hale's claim Laney purposely abstained from discharging Stewart in June 2009 so she could terminate Hale in October 2009 ignores the fact that Laney terminated a younger Operations Supervisor—Hale estimated that he was thirty-three or thirty-four years old—at the Calhoun terminal in June or July." And finally, "the record is replete with job-related, not age-related, criticisms of Hale's on-the-job conduct." *Hale v. ABF Freight Sys., Inc.*, No. 1:10-CV-184, 2011 WL 5238672, at *10 (E.D. Tenn. Nov. 1, 2011).

None of these reasons cut against a finding of pretext. First, that Hale did not mention age-related discrimination prior to his lawsuit simply means *Hale* may not have subjectively believed (or realized) he was discriminated against because of age. This does not translate to a finding that ABF did not in fact discriminate against him because of age. Second, Hale does not need to show that Laney was motivated by malevolence or hostility to older workers but simply that age was the determinative factor of his termination. Courts have found employment policies that use age as a

---

of fact regarding whether Hale was terminated because of his age.

benchmark to terminate someone or cut off employment benefits violate the ADEA, regardless of the intent behind such policies. *See, e.g., Johnson v. New York*, 49 F.3d 75, 77, 79-80 (2d Cir. 1995) (finding that employer's termination of plaintiff, despite employer's letter stating that the termination was "no reflection on [plaintiff's] almost seven years of dedicated service to [the] agency," violated ADEA because it was premised on an age-based criterion); *Erie Cnty. Retirees Ass'n v. Cnty. of Erie*, 220 F.3d 193, 211-12 (3d Cir. 2000) (finding that employer policy offering different health benefits depending on Medicare status violated ADEA because "Medicare status is a direct proxy for age" and that it was "irrelevant" whether employer had malevolent motive); *see also Ky. Ret. Sys. v. EEOC*, 554 U.S. 135, 147-48 (2008) ("[A] statute or policy that facially discriminates based on age suffices to show disparate treatment under the ADEA."). Third, the Calhoun operations supervisor is not a relevant comparator to Hale because the record indicates that the Calhoun terminal was shut down entirely. Though Hale mentioned that Laney decided against bringing the Calhoun operations supervisor to the Chattanooga terminal, this shows only that Laney decided against hiring another person, not that she kept Hale while terminating a younger employee. This, in fact, casts further doubt on Laney's stated need to lay off a supervisor because she apparently considered hiring an additional supervisor during the relevant time period.

Lastly, the fact that Laney made job-related rather than age-related criticisms of Hale does not necessarily establish that her termination decision was not based on age. The whole purpose of the *McDonnell Douglas* scheme is to afford a plaintiff an opportunity to show that facially legitimate criticisms and reasons for termination are actually a cover for age discrimination; reasoning that a plaintiff has failed to show pretext because the criticisms are job-related rather than age-related

undercuts the entire scheme. To survive summary judgment, a plaintiff need only put forth sufficient evidence from which a reasonably jury could disbelieve the employer's stated reason and infer that the real reason was unlawful discrimination. *See Reeves*, 530 U.S. at 147 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. . . . Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."); *cf. Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration . . . ."). Hale has met his burden.

For the reasons above, we find that Hale has established genuine issues of material fact regarding whether he was terminated because of his age.

## C. Hostile Work Environment

Hale also claims that he was subject to a hostile work environment because of age.[9] To state a hostile work environment claim under the ADEA, a plaintiff must establish four elements: (1) the employee is 40 years or older; (2) the employee was subjected to harassment, either through words or actions, based on age; (3) the harassment had the effect of unreasonably interfering with the

---

[9]Though Hale's complaint purports to state a hostile work environment claim under both the ADEA and THRA, his brief discusses only the ADEA and federal case law. Because his ADEA hostile work environment claim fails, we find that any analogous claim under the THRA also fails in the absence of any argument that a different standard should apply.

employee's work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer. *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-35 (6th Cir. 1996). Whether an environment is hostile or abusive is determined by looking at all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "Both an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000).

In support of his claim, Hale points to the spate of emails sent by Laney in March, which contained several comments expressing disappointment with Hale such as "you have let me down," "you were clueless," and "I continue to have the same problems with you over and over." Hale contends that a reasonable person would be overwhelmed by this barrage of criticism and that the emails interfered with his job because he was "forced to type email message after email message in response." This conduct simply does not rise to the level of severity or frequency required to sustain a hostile work environment claim. While such criticisms certainly may have been frustrating and discouraging, they were part of "the ordinary tribulations of the workplace" that do not amount to the sort of "extreme" conduct required to effect a "change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted); *cf. Plautz v. Potter*, 156 F. App'x 812, 819 (6th Cir. 2005) ("'[C]onversations between an

employee and his superiors about his performance does not constitute harassment simply because they cause the employee distress.'" (quoting *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998))). Hale has thus failed to show "an objectively intimidating, hostile, or offensive work environment." *Crawford*, 96 F.3d at 835.

## V.  CONCLUSION

For the reasons above, we REVERSE the district court's judgment on wrongful termination and REMAND the issue for trial. We AFFIRM the district court's judgment on the hostile work environment claim.